## WELLS v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9191.

Circuit Court of Appeals, Eighth Circuit.

Feb. 4, 1933.

James S. Y. Ivins, of Washington, D. C. (Kingman Brewster, of Washington, D. C., James B. Templeton, of Minneapolis, Minn., and O. R. Folsom-Jones and Richard B. Barker, both of Washington, D. C., on the brief), for petitioner.

Charles B. Rugg, Asst. Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and A. H. Fast and F. L. Van Haaften, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., and Erwin N. Griswold, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

KENYON, Circuit Judge.

This is a proceeding to review a decision of the Board of Tax Appeals, and involves income taxes for the years 1924, 1925, and 1926. The facts are not in dispute. Petitioner on December 30, 1922, created by separate trust indentures three certain trusts, which will be herein referred to as Trusts 1, 2, and 3. On August 6, 1923, he created two additional trusts, referred to as Trusts 4 and 5. The income from all these trusts and the principal, if necessary, was to be used by the trustee to pay premiums on certain policies of insurance on petitioner's life. As we deal with these trusts separately hereafter it will be sufficient to say at this point that they were created by irrevocable deeds of trust conveying certain property to a trustee by which benefits were conferred upon certain relatives of petitioner, annuitants, and charities. Petitioner did not include for the years in question in his income tax return the dividends received from the securities assigned to the trustee and used to pay the premiums on the life insurance policies. The Commissioner of Internal Revenue made a deficiency assessment of additional income taxes for these years, including in petitioner's taxable income that part of the dividends received by the trustee upon the securities constituting the corpus of each trust and used to pay the premiums on the insurance policies, claiming to do so in accordance with the provisions of section 219 (h), c. 234, of the Revenue Act of 1924, and section 219 (h), c. 27, Act of 1926 (26 USCA § 960 note). Sections 219 (g) and (h), which are closely related, are as follows:

"(g) Where the grantor of a trust has, at any time during the taxable year, either alone or in conjunction with any person not a beneficiary of the trust, the power to revest in himself title to any part of the corpus of the trust, then the income of such part of the trust for such taxable year shall be included in computing the net income of the grantor.

(h) Where any part of the income of a trust may, in the discretion of the grantor of the trust, either alone or in conjunction with any person not a beneficiary of the trust, be distributed to the grantor or be held or accumulated for future distribution to him, or where any part of the income of a trust is or may be applied to the payment of premiums upon policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for the purposes and in the manner specified in paragraph (10) of subdivision (a) of section 955 [214]), such part of the income of the trust shall be included in computing the net income of the grantor."

The policies on which premiums were paid were concededly not for the purposes specified in section 214 (a) (10) of the Revenue Act of 1924, 26 USCA § 955 (a) (10).

The Board of Tax Appeals sustained the deficiencies found by the Commissioner for the years 1925 and 1926, and increased the deficiency for 1924 to cover an error made by the Commissioner. The basis of its decision is thus expressed: "As to the contention that the trust corpus and the insurance policies were no longer a part of the petitioner's estate nor subject to his debts, it seems true that petitioner by the trust indentures and by the assignments of insurance policies has parted with all right to revest such property in himself. But by the terms of the trust indentures he has provided that the income

from the trust corpus shall discharge him from obligations which he had assumed and by the same indentures he has disposed of the proceeds of the insurance policies upon his death just as effectively as he could have done had he disposed of the same by will as a part of his personal estate."

When the case reached this court, being in doubt as to the questions involved, it certified the matter to the Supreme Court, and asked instructions as to these questions:

"Question 1. Does section 219 (h) of the Revenue Acts of 1924 and 1926 apply to irrevocable trusts?

"Question 2. Is section 219 (h) of the Revenue Acts of 1924 and 1926 constitutional as applied to irrevocable trusts created prior to the passage of the Revenue Act of 1924?

"Question 3. On the facts stated, did the petitioner receive income arising under the trusts during the years 1924, 1925, and 1926?"

May 2, 1932, the Supreme Court dismissed the certificate on the ground that the questions were not properly framed and that the statement of facts therein was inadequate. Wells v. Commissioner of Internal Revenue, 286 U. S. 529, 52 S. Ct. 503, 76 L. Ed. 1271.

We shall therefore attempt to answer our own questions duly impressed with the realization that it is more difficult to answer questions than to ask them.

After the return of the certificate to this court, a motion by respondent for reargument was granted, and it was directed that a supplemental record be submitted showing the five trusts and the insurance policies involved. This was done and respondent filed supplemental argument raising additional questions, viz., that Trusts 2 and 3 were invalid and could be revoked at any time by petitioner, and that he retained substantial interest in Trusts 2, 3, 4, and 5. It will make for clarity we think first to discuss fully the law with reference to Trust No. 1, concerning which the supplemental argument raises no new question, and then determine whether the other four trusts are assimilable on their facts and the law to Trust No. 1.

This trust was executed December 30, 1922, and is designated "Frederick B. Wells Trust For the Benefit of: Mary Wright Peavey Wells." She was his daughter. It was duly accepted by the trustee, Minneapolis Trust Company. By the trust instrument petitioner assigned, transferred, and conveyed to the Minneapolis Trust Company, of Minneapolis, Minn., as trustee, "Certificate No. 8 for 1000 shares of the six per cent cumulative preferred stock of the Wells Securities Company, a Delaware corporation, said stock being of the par value of $100.00 per share," to "take possession of, manage and control the trust estate, and demand, receive and collect the income and dividends therefrom, and invest and reinvest the trust estate, and * * * retain the corporate stock herein conveyed as long as it deems best, or * * * sell and convey the same, at such prices, in such parcels, and upon such terms as it may deem best." Reinvestments were to be made only in such securities "as are now authorized by the laws of the state of Minnesota for the investment of funds by trust companies."

The income of the trust estate, and as much of the principal as should be necessary, was to be used to pay the net annual premiums on ordinary life policy No. 472778 of the Connecticut Mutual Life Insurance Company of Hartford, Conn., issued December 30, 1922, for $100,000, on the life of petitioner and payable to the "Minneapolis Trust Company, Trustee," or its successors or assigns, as beneficiary. By the terms of the trust the trustee was given full power and authority "to deal with the said Insurance Company and with the said insurance in any manner that it may deem for the best interests of such Minneapolis Trust Company, as Trustee, and may borrow money thereon, or may avail itself of any of the conditions, privileges or benefits provided by the terms of the said policy of life insurance."

The policy itself contained the usual provisions for dividends to be either (1) paid in cash, (2) left with the company to mature the policy as an endowment, (3) applied on premiums, or (4) converted into paid-up additional insurance; for nonforfeiture benefits in the form of cash value payable on surrender or convertible into paid-up or extended insurance; for policy and premium loans; and for optional settlements at maturity. Dividends were expressly made payable to the "Minneapolis Trust Company, Trustee." In the event of the dividends being left to mature the policy as an endowment, the face value thereof was payable to the "payee," which was, of course, the Minneapolis Trust Company, as trustee. The plan of the policy could be changed "upon written request by the insured with the beneficiary," * * * and the mode of settlement could be changed upon "application by the insured with the beneficiary, * * * or upon application by the payee at the maturity of this policy." In his application petitioner specifically renounced all power to change the beneficiary, and designated the Minneapolis Trust Com-

pany, trustee, as the party to whom all life or death benefits should be made payable and who should exercise the options granted for change in plan, for paid-up or extended insurance, and for premium loans.

Any excess of the income of the trust estate over the amount needed to pay the first and successive net annual premiums upon the above policy of life insurance was to be accumulated until sufficient to pay one additional net annual premium and after that was to be paid, in the discretion of the trustee, at the end of each year, to Mary Wright Peavey Wells, daughter of petitioner.

Upon the death of petitioner the trustee was to collect the proceeds of the policy and purchase therewith from the executor of petitioner's estate securities thereof to the appraised value of $100,000. The securities so purchased were thereupon to become a part of the trust estate, the whole income of which was thenceforth to be payable to the said Mary Wright Peavey Wells, for her life. Upon her death the trust was to cease and determine, and the corpus be paid over to whomsoever she should, by her will, appoint to receive it. Should she fail to exercise her power of appointment, the corpus was to go "to her issue living at the time of her death, and to the issue of a deceased child by right of representation." Should she neither exercise her power of appointment nor leave issue, then the trust estate was to be "paid over and distributed in equal parts to my sons Thomas Bucklin Wells, born August 26th, 1902, Frank Hutchison Peavey Wells, born September 29th, 1905, and Frederick Brown Wells, Jr., born November 6, 1906, or the survivors or survivor of them, upon the date when the youngest of my said sons or the youngest of the survivors attains the age of twenty-five years." This trust, and the others likewise, were completed and the property transferred prior to the passage of the 1924 Revenue Act, and no power of revocation, alteration, or modification is reserved to petitioner as settlor either alone or in conjunction with any one else.

It is the theory of petitioner as to this and the other trusts that he parted with all his interest in the securities transferred to the trustee; that the trustee under the terms of the trust was authorized and directed to use the income from these securities which constituted the corpus of the trust to pay premiums upon insurance policies on the life of the grantor, which policies were transferred to the trustee, with no right on the part of petitioner to change the beneficiary named therein, the trustee; that all control over the securities and the policies of insurance was with the trustee, and no control whatever reserved to petitioners; that under the terms of the various trusts he had no right to revoke the same; that the conveyance of the corpus of the trust was absolute and the ownership of the insurance policies became absolute in the trustee; that the trusts were created and completed prior to the passage of the act under which respondent assessed taxes to petitioner as alleged income taxes for the years in question. Petitioner contends that these trusts were not created for the purpose of evading provisions of possible future statutes, but for the purpose of legitimately reducing taxes under the existing statutes; that the trustee received the income and paid the taxes thereon; and that section 219 (h) if applicable to this situation violates the Fifth Amendment to the Constitution.

It is respondent's theory that subdivision (h) of section 219 is not ambiguous and requires no construction by a court; that it applies to irrevocable as well as revocable trusts; that petitioner received the benefit of the trusts each year measured partly by the premiums due and paid for him by the trustee; that his interest did not cease with the transfer of the policies since a failure of the trustee to pay the premiums promptly would defeat the purpose of the trust. Further, that grantor's estate received a benefit from the operation of certain of the trusts by the provision that the trustee should with the insurance money buy securities from petitioner's estate at their appraised valuation, thus making available to his estate large sums of cash; that if petitioner can escape a tax in this manner he has accomplished by indirect means that which the law would not permit him to accomplish directly.

It is suggested in respondent's brief that the final contingent remainder in Trust No. 1 is in violation of the common-law rule against perpetuities in force in Minnesota, in that Wells may be presumed capable of having another child whose interest might not vest within lives now in being plus twenty-one years. It seems clear that all the interests that may have vested in the remainder are identified and in being, and that if a child of Wells might yet be born it could take no interest in the final contingent remainder of this trust. Of course, Wells' child might predecease him, and the trust estate might revert to Wells for want of a cestui, or as heir of his child; but we think this is a possibility that cannot be considered a present property interest. There was the same possibility in Coolidge v. Long, 282 U. S. 582, 51 S. Ct.

306, 75 L. Ed. 562, and Reinecke v. Northern Trust Co., 278 U. S. 339, 49 S. Ct. 123, 73 L. Ed. 410, 66 A. L. R. 397, and in both cases the Supreme Court held that since the settlor had not reserved power to revoke the trust the transfer of all that ever was or ever would be transferred was complete as soon as the trust was made. This is true of the situation here.

Assuming that petitioner divested himself as completely as possible of any interest in or power over the property comprising the trust estate and had no interest in or control over the insurance policy, the chief object of the trust, can the income of the trust, irrevocable in its nature, be made taxable to the grantor by an act of Congress passed subsequent to its creation?

 It is clear that Congress intended section 219 (h) to be applicable to irrevocable as well as to revocable trusts—otherwise the statute would be redundant. Section 219 (g) is applicable to revocable trusts, and there would be no need of 219 (h) if it was not applicable to irrevocable trusts. The words of a statute should be given their ordinary meaning. We see no ambiguity in this statute and nothing to construe. Its meaning is plain and shows the intention of Congress. We shall not spend much time on the argument as to the retroactivity of the statute affecting its constitutionality. Congress was not attempting to tax the creation of a trust as a transfer, but the income therefrom. Income is taxable as of the time it is severed from the corpus that produces it. Income produced even before the ratification of the Sixteenth Amendment has been held taxable as of a later period. Lynch v. Hornby, 247 U. S. 339, 38 S. Ct. 543, 62 L. Ed. 1149. More retroactivity of a congressional taxing statute does not make it unconstitutional. That is settled by many cases. Brushaber v. Union Pacific R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Cooper v. United States, 280 U. S. 409, 50 S. Ct. 164, 74 L. Ed. 516; Woods v. Lewellyn (C. C. A. 3) 252 F. 106; Frew v. Bowers (C. C. A. 2) 12 F.(2d) 625.

 Of course, the income from the securities of the trust during the years in question was properly taxable. The inquiry is whether it was taxable to petitioner, and the question is one of constitutional power—not of retroactivity. Can Congress provide that the income of an irrevocable trust created prior to the passage of the taxing act shall be taxed to the settlor on the ground that it is his income even if he has legally put himself in a position where he would never receive it? That is the concrete question here. Can Congress prevent a party from conveying away his property or raise up a fiction by which if he does so he will yet be treated as if he had not? We are dealing here, it is true, with trusts created prior to the passage of the taxing statute, and hence should confine ourselves to that situation, regardless of whether we may think it material whether created before or after, and we are not unmindful of the rule often announced by the Supreme Court that a construction of a statute reasonably possible which would uphold it should be adopted.

Eisner v. Macomber, 252 U. S. 189, 207, 40 S. Ct. 189, 193, 64 L. Ed. 521, 9 A. L. R. 1570, adopts the definition of "income" as follows: " 'Income may be defined as the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets, to which it was applied in the Doyle Case, 247 U. S. 179, 183, 185, 38 S. Ct. 467, 469 (62 L. Ed. 1054)." See, also, United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180.

In Van Meter v. Commissioner of Internal Revenue (C. C. A. 8) 61 F.(2d) 817, 818, Judge Stone said:

"The Supreme Court has definitely determined that Congress has the power to tax the *earner* of income therefor, irrespective of whether it is paid to someone else. * * *

"The 'earner' of income is one whose personal efforts have produced it; who owns property which produced it or a combination of the two. * * *

"The rule and intent of the taxing statutes is that the earner of income which he might and, normally, would receive and enjoy for himself is not relieved because he chooses not to receive or not to enjoy it, and this is not necessarily changed by such deprivation taking the form of an obligation legally binding him thereto. If there exists a legal relationship of the earner to others which results in the earnings (in part or whole) being for the benefit of others than the actual earner, the statutes do not attempt to tax the earner for such income as he was not earning in his own right, but where the earner of the income does nothing more than transfer the income earned in his own right to another, even though such disposal be in advance of the earning thereof, * * * or where he retains any power of control over the income earning property or the income therefrom, * * * such income is taxable to him within the intent of the statute."

This case was one where the income was assigned by the "earner" thereof in advance of its receipt, and of course such assignment did not preclude its taxation to the one who but for the assignment would have received and enjoyed it. Lucas v. Earl, 281 U. S. 111, 50 S. Ct. 241, 74 L. Ed. 731; Burnet v. Leininger, 285 U. S. 136, 52 S. Ct. 345, 76 L. Ed. 665.

The situation would be very different if the earner were in such legal relation with another that he would be prevented from effectively dealing with the income.

Since the former argument of this case the Supreme Court has decided two cases of importance bearing we think on the question here. In Hoeper v. Tax Commission, 284 U. S. 206, 52 S. Ct. 120, 76 L. Ed. 248, it held that a Wisconsin income tax statute authorizing an assessment against a husband of a tax computed on the combined total of the income of his wife and himself and augmented by surtaxes resulting from the combination, under the law of the state the husband having no interest in the income of the wife, was violative of the Fourteenth Amendment. We quote from page 215 of 284 U. S., 52 S. Ct. 120, 122, this significant language: "We have no doubt that, because of the fundamental conceptions which underlie our system, any attempt by a state to measure the tax on one person's property or income by reference to the property or income of another is contrary to due process of law as guaranteed by the Fourteenth Amendment. That which is not in fact the taxpayer's income cannot be made such by calling it income." And in Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772, the court held that the restraint upon legislation by the due process clause of the Fourteenth Amendment and the Fifth were the same.

In Langley v. Commissioner of Internal Revenue (C. C. A. 2) 61 F.(2d) 796, the court had before it section 166 of the Revenue Act of 1928 (26 USCA § 2166), providing that income from a trust shall be taxed to the grantor if he has at any time during the taxable year the power to revest in himself title to the corpus of the trust. The purpose of that section was to prevent an evasion of surtaxes just as it is the purpose of 219 (h). As the grantor could not by her own act revest herself with title to the property during the year 1928 within the terms of the trust and had no control over the principal until the termination of the trust in that year, it was held she had lost control of the income during the period of taxation, and that she was not subject to taxation within the purview of section 166.

The Board of Tax Appeals, in Mabel A. Ashforth et al. v. Commissioner, 26 B. T. A. 1188, decided October 12, 1932, has in part taken a somewhat different view of the trust question than it did in the present case. That case concerned section 219 (g) of the Revenue Act of 1926, supra, and the Board of Tax Appeals held that the income of the trust there involved should not be taxed to the grantor, although he had reserved the power of revocation, which however was subject to a condition, to wit, notification to the trustees prior to the beginning of the taxable year, or within the "first fifteen days in December in the calendar year next preceding"; and that as he had failed to notify the trustees of an intention to revoke or change the trust within either taxable year the income was not subject to the grantor's "unfettered command," and he was not free to enjoy it during the taxable year.

A case bearing some similarity to the instant case is Reinecke v. Smith (C. C. A. 7) 61 F.(2d) 324, arising under section 219 (g), supra. The court there lays some stress upon the fact that the trusts were created before the passage of the act. It points out that when the trusts were established the grantor was not taxable on the income thereof, as the power to revoke the same could not be exercised by him alone, the consent of the trustee being essential to revocation. The court said that by the creation of the trusts the grantor had parted with his interest in and control over the income of the trusts, and that while the power of Congress as to the taxation of the income of trusts under the unfettered control of the grantor, or which may be created in the future was broad, that nevertheless that which was not the income of a taxpayer and which he could not make a part of his income could not by legislative power be made to be included in the income; that it amounted to confiscation and offended the Fifth Amendment.

In Du Pont v. Commissioner of Internal Revenue (C. C. A. 3) 63 F.(2d) 44 (opinion filed January 6, 1933), the court considered a situation where petitioner had executed nine trust agreements for the benefit of his family, transferring thirty-two policies of life insurance and certain shares of stock to the trustee, the income to be applied to the payment of premiums on the insurance policies. The court construes subdivision (h) of section 219, supra, and the question we are considering as applied to the facts before it. The same questions presented here were

raised there by petitioners. The court held that the term "trust" as used in the statute included revocable and irrevocable trusts; that Congress had not exceeded its powers in taxing the income of such trust to the grantor. The facts are quite different, however, in the Du Pont Case from the facts here. The trusts there were for three years with privilege of renewal or nonrenewal in grantor, and the trust agreements provided that if the trusts terminate before death of petitioner the stock transferred to the trustee is to be returned to him. The court considered that petitioner had merely postponed his right for the term of the trusts to command the fund and to terminate the existence of the trust. In the trusts there the control of the property had only been temporarily placed beyond the control of the grantor. Had the securities been given to a trustee with no power in the settlor ever to receive them back we apprehend the decision might not have been the same. If the facts here were the same as there we should reach the same conclusion.

In Corliss v. Bowers, 281 U. S. 376, 50 S. Ct. 336, 74 L. Ed. 916, subsections (g) and (h) of 219 of the Revenue Act of 1924, were involved. The instrument there creating the trust reserved power to modify, alter, or revoke it. There was no doubt, the court said, that petitioner reserved the power at any moment "to abolish or change the trust at his will," and the court says, page 378 of 281 U. S., 50 S. Ct. 336, 337: "Still speaking with reference to taxation, if a man disposes of a fund in such a way that another is allowed to enjoy the income which it is in the power of the first to appropriate it does not matter whether the permission is given by assent or by failure to express dissent. The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." The power to revoke the trust in this case had not been exercised and the income therefrom had in fact been paid over to the beneficiary. This case would seem to settle the proposition that subsections (g) and (h) of section 219 of the Revenue Acts of 1924 and 1926 (26 US CA § 960 note) are constitutional as applicable to the income of revocable trusts whether created prior or subsequent to the passage of the first of these acts.

Burnet v. Leininger, 285 U. S. 136, 52 S. Ct. 345, 76 L. Ed. 665, was a case where the husband, member of a partnership, had agreed with his wife that she should be an equal partner and share equally with him the profits and losses. His distributive share of the net income of the partnership it was held was taxable to him, and that as the wife's interest was derived from and dependent upon his distributive share the taxation of the whole as his income was not unconstitutional. It was a different situation from that presented in Hoeper v. Tax Commission, supra, where the income of the wife was from her separate estate.

In Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772, the court discusses the presumption clause of section 302 (c) of the Revenue Act of 1926 (26 USCA § 1094 (c), and holds it cannot be sustained as imposing a gift tax because the intent of Congress was to enact the provision as an incident of the death tax, and further that as a gift tax it would be so arbitrary and capricious as to violate the due process clause of the Fifth Amendment. The value of the estate had come into being after the gift had become complete and irrevocable, and the court says the gift was no part thereof, and at page 332 of 285 U. S., 52 S. Ct. 358, 363, "to impose liability for the tax, as a gift tax, upon the estate, as they in terms require, is, in effect, to exact tribute from the gains or property of one measured by the gains or property of another."

In a very recent opinion of the Supreme Court (January 9, 1933) in Guaranty Trust Co. v. William H. Blodgett, Tax Commissioner, 53 S. Ct. 244, 245, 77 L. Ed. ——, Justice Sutherland refers to the holding in Coolidge v. Long, 282 U. S. 582, 51 S. Ct. 306, 75 L. Ed. 562, saying: "There a similar tax was held bad because the state statute imposing it was passed after the creation of the trusts;" and refers with approval to the statement of that case, "Undoubtedly the State has power to lay such an excise upon property so passing after the taking effect of the taxing act." In Coolidge v. Long, supra, it was held that under the due process clause of the Fourteenth Amendment a gift cannot be taxed by a state under a law that was enacted after the gift was fully consummated.

In Chase National Bank v. United States, 278 U. S. 327, 49 S. Ct. 126, 73 L. Ed. 405, 63 A. L. R. 388, one Brown after the passage of the Revenue Act of 1921, had taken out three policies of insurance, reserving the power to change the beneficiary and paying the premiums himself. Upon his death the amount of this insurance, less $40,000, was included in his estate in measuring the transfer tax thereon and this was upheld as an excise or privilege tax.

In Untermyer v. Anderson, 276 U. S. 440, 48 S. Ct. 353, 72 L. Ed. 645, it was held

that the gift tax provisions of the Revenue Act of June, 1924, were to be construed as applying to gifts made at any time during that year, and that as to gifts not made in anticipation of death and fully consummated prior to the passage of the act, the provisions were arbitrary and invalid under the due process clause of the Fifth Amendment.

In Lewellyn v. Frick, 268 U. S. 238, 45 S. Ct. 487, 69 L. Ed. 934, the policies of insurance sought to be included in decedent's estate under section 402 (f) of the Revenue Act of 1918 (40 Stat. 1098) had been taken out before the Revenue Act was passed, and failed to reserve power to change the beneficiary, or else had been transferred by assignment. At page 251 of 268 U. S., 45 S. Ct. 487, 488, Justice Holmes raises doubt about the validity of such tax, saying: "It is enough to point out that at least there would be a very serious question to be answered before Mrs. Frick and Miss Frick could be made to pay a tax on the transfer of his estate by Mr. Frick. There would be another if the provisions for the liability of beneficiaries were held to be separable and it was proposed to make the estate pay a transfer tax for property that Mr. Frick did not transfer. Acts of Congress are to be construed if possible in such a way as to avoid grave doubts of this kind."

In Blodgett v. Holden, 275 U. S. 142, 48 S. Ct. 105, 72 L. Ed. 206, it was held that in so far as the Revenue Act of 1924 undertakes to impose a tax on gifts if consummated before its provisions came before Congress it is invalid under the due process clause of the Fifth Amendment. Even under the doctrine of the dissenting opinion in that case, reading the statute to tax gifts only that were made thereafter, there would be authority for the petitioner's position here as to this trust, which was in the nature of a gift, and was fully consummated prior to the passage of the act.

In Rosenwald v. Commissioner of Internal Revenue (C. C. A. 7) 33 F.(2d) 423, it was held that when taxpayer had delivered to a charitable trust negotiable Liberty Loan bond coupons as a gift, the coupons were not taxable against him as income.

Some of the cases we have referred to deal with the power to levy a transfer or succession tax at death, and they bear analogy to the question here presented. The relation that must exist between the taxpayer and the income for which he is taxable should be no different than the relation which must exist between a decedent and the property by which a transfer or succession tax is to be measured, and the cases we have cited lead we think to the conclusion that the trust property under Trust No. 1 could not have been subjected on petitioner's death either to a federal transfer tax or a state succession tax. If the trust property may not be made a part of petitioner's estate at death, it is difficult to understand how the income therefrom may be part of his income during life.

We have assumed this far that under Trust No. 1 petitioner had irrevocably parted with the securities and reserved no control whatever over them or the income from them. If in fact petitioner has reserved any power of control over the income earning property or the income therefrom then such income could be taxed to him. Has he done so?

■ Income to be subject to assessment for taxation need not necessarily be received in money. Brunton v. Commissioner of Internal Revenue (C. C. A. 9) 42 F.(2d) 81; Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570.

■ Is there any taxable relation between the property and petitioner as the recipient of such benefits therefrom as could be considered income? There was evidently no earner relationship between petitioner and the income of Trust No. 1. It was produced neither by his labor, his property, nor property over which he had an unfettered command; nor was there a mere assignment of income within the rule of Van Meter v. Commissioner of Internal Revenue, supra.

The Board of Tax Appeals in holding that he had power over the trust property so that in a fact sense he has received benefit therefrom gave considerable weight to this provision of the trust instrument: "4. Upon my death, the trustee shall collect the principal sum named in the said policy of life insurance, and shall with the proceeds thereof, purchase from the executor of my estate, securities belonging to the said estate, amounting to the sum of One Hundred Thousand Dollars ($100,000.00), at the appraised value of such securities, and such securities shall thereupon become and be a part of the trust estate hereby created. My trustee shall take possession of, manage and control the securities so purchased from my executor, and shall demand, receive, and collect the income and dividends therefrom, and invest and re-invest the trust estate, and may retain the same as long as it deems best, or may sell and convey the said securities at such prices, in such parcels, and upon such terms as it may deem best, but in the event that it sells the

said securities, the proceeds of such sale or sales shall be re-invested only in such securities as are now provided by the laws of Minnesota for the lawful investment of the funds of Trust Companies." We think it the only provision or circumstance upon which any reasonable argument can be made that the petitioner might have secured some taxable benefit from the trust.

From one viewpoint it would seem that petitioner has accomplished exactly what he would have accomplished if the policy had been payable directly to his estate.

The Board of Tax Appeals was in error in holding that the income from the. trust corpus discharged petitioner from obligations which he had assumed—that is, the assumption of premium payments on the insurance policies. There is no legal obligation to pay a premium on an insurance policy and the owner may permit it to lapse.

There is, of course, a moral and social obligation to provide for one's family even after the earner is gone, and insurance is a means of meeting that obligation. If a trust were established the income from which was to be used to pay the necessary household expenses of the settlor that part of the income that would be so used would be of benefit to him, for there is a legal duty to pay for the family necessities; there would be an enrichment, and the case would be assimilable to Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U. S. 716, 49 S. Ct. 499, 73 L. Ed. 918, upon which the Board of Tax Appeals banked heavily, and United States v. Boston & Maine R. R., 279 U. S. 732, 49 S. Ct. 505, 73 L. Ed. 929.

This provision which we are considering obviously will not enrich petitioner's estate, and is therefore to be distinguished from the situation that would exist had the proceeds of the policy been made payable to the estate. The provision merely anticipates the situation that will exist on petitioner's death, when the trustee will be in need of long-term investments in which to place the proceeds of the policies, and petitioner's estate will possibly be in need of ready cash. The trustee will be a party to the purchase, with a voice in the selection of the securities to be purchased, and as the purchase price is to be the appraised value of the securities there is no possibility by which worthless and unsalable securities will be unloaded from petitioner's estate onto the trustee by virtue of the trust provision. Possibly petitioner had such confidence in his own investments that he was motivated by a desire to have the proceeds of

the policy invested soundly and wisely in the interests of the trust estate. At any rate, such benefit as will inure by the provision to his estate will be a convenience rather than an enrichment, and will in no way be available to petitioner while living or to his estate in bankruptcy, should he become bankrupt. How is such a future convenience to be measured, either in money or in money's worth, as a present asset of petitioner's? And to be taxable as income, benefits must above all be measurable.

In Hoeper v. Tax Commission of Wisconsin et al., supra, the majority of the court were no doubt cognizant of the fact that the income of the wife which they held not taxable to the husband, would in the language of Mr. Justice Holmes expressed in dissent "in every probability * * * make his [the husband's] life easier and help to pay his bills." We think no control over the insurance policy was retained by the provision in question.

The fact is not important that by the terms of the policy insured was to join with the beneficiary in any request that should be made for a change in the plan of the policy or mode of settlement. This is not the equivalent of an interest in or control over the policy, and did not take the control of the policy from the trustee.

It is urged that the whole purpose of petitioner's plan in the creation of these trusts was to evade taxes. Undoubtedly the purpose was to relieve himself from a part of a large surtax. If he acted strictly within the law it probably could not be deemed tax evasion. As said by Mr. Justice Holmes in Bullen v. Wisconsin, 240 U. S. 625, 630, 36 S. Ct. 473, 474, 60 L. Ed. 830: "We do not speak of evasion, because, when the law draws a line, a case is on one side of it or the other, and if on the safe side is none the worse legally that a party has availed himself to the full of what the law permits. When an act is condemned as an evasion, what is meant is that it is on the wrong side of the line indicated by the policy if not by the mere letter of the law." The reports of Congressional Committees show that Congress passed the act in question for the purpose of preventing tax evasions. Evidently this method of lessening surtaxes had become somewhat prevalent. It is unfortunate that some people of great wealth are not willing to bear their fair part of the burden of taxation and are willing to place the burden which they should carry upon others. If they can do so within the law courts are powerless to prevent it. It is how-

ever preferable that there be some tax evasion than that rights guaranteed by the Constitution be lightly set aside. Hooper v. Tax Commission, supra; Heiner v. Donnan, supra. As said in Clapp v. Heiner (C. C. A. 3) 51 F.(2d) 224, 225: "Even since the Statute of Uses, the trust has served as a means of escape from the embarrassments of ownership. Its employment to avoid this particularly onerous incidence was inevitable. So the estate was divided among the family and the surtax became the inverse reward of fertility. Taxation being by definition dependent upon beneficial receipt, the government had no answer for this procedure unless it was willing to declare such transactions presumptively fraudulent." Congress may clearly tax such a transaction as that involved in the instant case for what it really is, a gift inter vivos; but so long as petitioner is willing to relinquish the advantages in order to avoid the burdens of continued ownership and effectively does so Congress may not continue to impose the burdens.

We are unable to reach any other conclusion as to Trust No. 1 than that petitioner in creating the trust divorced himself from any beneficial interest in the insurance policy, that he retained no control of any kind over it nor over the corpus of the trust, and that the payment of the insurance premiums by the trustee resulted in no enrichment to him or his estate; that the income sought to be taxed to him was not his income and did not benefit him, that to tax the same to him under section 219 (h) is beyond the power of Congress and violative of the Constitution.

### Trust No. 2.

 The instrument creating this trust was executed December 30, 1922, and designated as being for the benefit of Shirley Irene Lindstrom. By it petitioner assigned, transferred, and conveyed to the Minneapolis Trust Company and Leontine Lindstrom, as trustees, "Certificate Number 3 for seventy-five (75) shares, par value One Hundred Dollars (100.-00) per share, of the six per cent (6%) cumulative preferred stock of The Wells Securities Company," $450 in cash, and ordinary life policy No. 591935 of the Massachusetts Mutual Life Insurance Company, of Springfield, Mass., issued November 27, 1922, for $10,000, on the life of petitioner and payable to his executors, administrators, or assigns as beneficiary. The powers of management and of investment and reinvestment given the trustees, along with the limitations imposed thereon, were the same as those provided by Trust No. 1, described above. The income of the trust estate, and as much of the principal as should be necessary, was to be used "to pay the net annual premiums falling due upon that certain policy of life insurance hereinbefore conveyed and described." The trustees were given full power and authority "to deal with the said Insurance Company and with the said insurance, in any manner that they may deem for the best interests of the said Shirley Irene Lindstrom, and may borrow money thereon, or may avail themselves of any of the conditions, privileges or benefits provided by the terms of the said policy of life insurance."

The policy thus assigned as a part of the trust estate was not unlike, in its general provisions, the policy described in connection with Trust No. 1, except that it was originally payable to petitioner's executors, administrators or assigns, and the life benefits and powers belonged originally to petitioner himself. But on the face of the policy there was indorsed the following:

"Springfield, Mass., January 16, 1923. The proceeds of this policy are hereby made payable, at the death of the insured, in one sum to the Minneapolis Trust Company and Leontine Lindstrom, of Minneapolis, Minnesota, as Trustees, or their successors in trust, in accordance with trust agreement dated December 30, 1922, without liability on the part of the Insurance Company to see to the carrying out of the terms of the trust. The right to make future changes of any beneficiary herein, without the consent of the beneficiary or beneficiaries herein, has been revoked and canceled; a legal request therefor having been received.
"[Signed] Albert D. Shaw, Asst. Secy."

By this provision, coupled with the assignment in the trust instrument of the policy itself to the trustees, petitioner was completely divested of the same rights, powers, and life benefits that he had renounced from the beginning with respect to the policy in Trust No. 1; and the proceeds of the policy became equally payable on maturity to the trust named.

The trust instrument next provided that upon petitioner's death the trustees were to "pay over and deliver to the Minneapolis Foundation, a corporation organized for charitable and benevolent purposes under the laws of the State of Minnesota, with principal place of business in Minneapolis, Minnesota, the certificate of corporate stock in The Wells Securities Company, hereinbefore described and conveyed, or the securities held in lieu thereof and purchased with the pro-

ceeds of the sale of the aforesaid stock certificate, which part of the 'trust estate shall be held by the said Minneapolis Foundation, under the trust hereinafter defined, for the benefit of Wells Memorial, an unincorporated charity hereinafter identified." The perpetual trust thus created was further defined as follows: "The net annual income of the trust estate shall be paid to the Rectors, Wardens and Vestrymen of St. Marks Church, in Minneapolis, Minnesota, a corporation, to be used by said corporation for the sole purpose of carrying on the work of the Wells Memorial, a definite charity conducted by the said Church Corporation." However, should the Wells Memorial "cease to be conducted as a definite charity under its present name, or * * * cease to discharge substantially the functions which it now discharges," the income of the trust estate was to belong beneficially "to the Minneapolis Foundation, for its own uses and purposes."

The above perpetual trust was to come into enjoyment at an earlier date than the death of Wells in the event of the prior decease of Shirley Irene Lindstrom, beneficiary of the living trust hereafter to be described, by virtue of the following provision: "6. If the said Shirley Irene Lindstrom shall predecease me, this trust shall fail and determine upon her death, and the Trustees herein named shall forthwith surrender the said policy of life insurance for cancellation, collect its cash surrender value, and pay the same over to the Minneapolis Foundation, a corporation hereinbefore described, to which corporation I hereby presently give and convey the same, not for its own use and benefit, however, but upon the trusts hereinafter defined."

In the event, however, of Shirley Irene Lindstrom's outliving Wells, the trustees were upon the death of Wells to collect the proceeds of the policy of insurance, and thereafter to "invest and re-invest the same within their discretion, and may sell and re-sell the securities so purchased." The following provision was then made for the payment over of the income and principal of the trust estate remaining in the hands of the trustees: "After my death, the Trustees shall disburse the annual income from that part of the trust estate remaining in their hands after the acceptance by the Minneapolis Foundation of the trust hereinafter defined, to-wit: the income upon the investment of the proceeds of the life insurance policy hereinbefore described and conveyed, and so much of the principal from time to time as may, in their discretion, be necessary for the support, maintenance and education of the said Shirley Irene Lindstrom, * * * The Trustees shall pay over to Shirley Irene Lindstrom, when she attains the age of twenty-five years, the entire trust estate in their hands then remaining, but they may in the exercise of their discretion, pay the same over when she attains the age of twenty-one years." No provision was made for a gift over of the proceeds of the insurance policy remaining in the hands of the trustees in the event of Shirley Irene Lindstrom's surviving Wells but not attaining the age of twenty-one years.

The trust instrument concluded with provisions applicable to both the living and perpetual trusts, one of which was: "The living trust, that is to say, the trust herein limited upon my life for a shorter period upon the happening of the contingencies named, wherein the Minneapolis Trust Company is Trustee, and the perpetual trust presently defined but to take effect thereafter, wherein the Minneapolis Foundation is Trustee, shall both be administered under the direction of the Court as by Statute provided, but each is separate and distinct from the other and of like effect as though created and defined by separate instruments."

The provisions of the above trust instrument were accepted by the Minneapolis Foundation as well as by the trustees of the living trust. As to this trust respondent makes the contention, in addition to those made and considered in reference to Trust No. 1, that the perpetual trust is void under Minnesota law, that petitioner may therefore at any time, in accordance with the terms of the trust instrument, retake possession of the entire trust estate, and that the entire trust is therefore a revocable one, the income of which is taxable to petitioner under Corliss v. Bowers, 281 U. S. 376, 50 S. Ct. 336, 74 L. Ed. 916.

This question was not presented to the Board of Tax Appeals nor upon the former submission of the case in this court. The theory is opposed to the holding of the Board of Tax Appeals that petitioner had parted with all right to revest the trust property in himself.

It is observable that petitioner creates virtually two trusts: One, the living trust, of which the Minneapolis Trust Company is trustee; the other, a perpetual trust, of which the Minneapolis Foundation is trustee. And in the provisions applicable to both trusts is this: "Should the accumulation of income provided in the living trust be for any reason declared void, such accumulation shall be

paid over and delivered to the Minneapolis Foundation for its own uses and purposes, but should either the living trust or the perpetual trust herein defined be declared void as a trust, then the trust estate shall revert to myself, if living; otherwise to my heirs, executors, administrators or assigns."

When this trust was established, section 6701, Statutes of Minnesota 1913, provided that "uses and trusts, except as authorized and modified in this chapter, are abolished." Section 6710 provided by subsection 5 "that express trusts could be created for certain purposes." That section is: "To receive and take charge of any money, stocks, bonds, or valuable chattels of any kind and to invest and loan the same for the benefit of the beneficiaries of such express trust; and the district courts of the state shall, upon petition and hearing have power to appoint a trustee for the purpose herein set forth, requiring such trustee to give such bond for the faithful execution of such express trust as to the court may seem right and proper; and express trusts created under the provisions of this paragraph shall be administered under the direction of the court." Before the first enactment of subsection 5, which was in 1875 (Laws Minn. 1875, c. 53), no trust in personalty could be created in Minnesota, all trusts except those particularly authorized by statute being abolished. Reliance is placed upon respondent upon some early cases, the principal one being Shanahan v. Kelly, 88 Minn. 202, 92 N. W. 948, decided in 1903, which held that since 1875 all express trusts, including charitable trusts in personal property except as authorized by the statute, were abolished the same as trusts in real estate, and that the trust attempted to be created, which could be sustained if at all only under subdivision 5 of section 4284, chapter 43 of the Minnesota Statutes, then in force as to uses and trusts, was not sufficiently certain as to beneficiaries to come under subsection 5. In Watkins v. Bigelow, 93 Minn. 210, 100 N. W. 1104, it was held that a gift to a corporation with directions as to the use or management of the subject-matter of the gift consistent with corporate purposes of the donee was not a gift in trust but an absolute one to the corporation within the meaning of the statute of uses and trusts. The case of Young Men's Christian Ass'n of Minneapolis v. Horn, 120 Minn. 404, 139 N. W. 805, 806, is most enlightening on this subject. By the terms of the trust instrument there considered certain real and personal property had been conveyed to the defendant trustee "to and for the benefit of the Young Men's Christian As-

sociation of the City of Minneapolis, a corporation of the state of Minnesota, the same to be received and used by said corporation in perpetuity in carrying out its purposes of providing boys and young men, members of the association, with education along industrial lines." The court concluded that the trust in question was not invalid. After referring to the various Minnesota cases, including those cited by respondent, the court says:

"Under the doctrine of these cases, we think that the gift of the income of the bond, covered by the first trust herein involved, must be sustained, notwithstanding that the donor intended that the young men and boys mentioned should receive the ultimate benefit of the gift. The language of the donation plainly indicates a gift of the proceeds of the bond to the corporation, with directions as to its use, or possibly upon condition. To hold that the young men and boys referred to are the beneficiaries in the sense contemplated by our trust statutes and the cases construing the same would be a very strained construction. If the donor had seen fit to make periodical gifts of the proceeds of this bond directly to the corporation, each gift would, under our decisions, unquestionably have been valid. Then why should the gift be invalidated because made through a third party? 'Qui facit per alium facit per se.' Is the beneficiary any the less uncertain where the gift is through a third person? Here we have a gift, or rather a series of gifts, made through a trustee, to a certain corporation, for use in carrying out one of the purposes for which it was incorporated, and we cannot distinguish the case from either Lane v. Eaton [69 Minn. 141, 71 N. W. 1031, 38 L. R. A. 669, 65 Am. St. Rep. 559], supra, or Atwater v. Russell [49 Minn. 57, 51 N. W. 629, 52 N. W. 26], supra. In the latter case, indeed, the gift was to trustees for the purpose of sale and payment of the proceeds to a certain corporation, which was to receive the same for a certain use, and the gift was upheld.

"We must not confuse the question of the validity of the trust as creating a perpetuity with that concerning the certainty of the beneficiaries. These questions are entirely separate and distinct; and, having held that the trust is valid so far as concerns perpetuities, we fail to see how any other conclusion with regard to the other question can be reached than as above indicated. In short, since a gift in the terms of this trust would have been valid if it had been made directly to the corporation, and since there is nothing illegal in the power which he has conferred upon the

trustee to make the gifts, the trust must be sustained."

This review of the authorities relied on by respondent shows conclusively that they do not hold trusts for charitable purposes to be illegal in Minnesota, but that rather they require certainty as to the beneficiary of such trusts. They further indicate that where a gift is made to a corporation for certain purposes consistent with the corporate charter and organization, though too indefinite to be in themselves the cestui que trust, the gift will if possible be construed as a gift absolute to the corporation, with directions as to its use, or possibly upon condition, rather than in trust. Such a gift may be made of the income of a trust estate. This was the very situation in Young Men's Christian Ass'n of Minneapolis v. Horn, supra. The real cestui of this trust of the corpus was the Young Men's Christian Association, the corporation, rather than the boys and young men to whose education along industrial lines it was required to devote the income which it, as cestui, received. It seems to us the situation in this case is exactly parallel to that in the instant case. There the trustee was to collect the income. Here the situation is the same. There it was to be paid to the Young Men's Christian Association, a charitable corporation; here it was to be paid to "the Rector, Wardens and Vestrymen of St. Marks Church," a religious corporation. There it was to be received and used for providing boys and young men with education along industrial lines; here to be used by said corporation for carrying on the work of the Wells Memorial—a charity.

The language of the present trust instrument is in our opinion much more consonant with a gift on condition of the income of the trust estate to the "Rector, Wardens and Vestrymen of St. Marks Church, in Minneapolis, Minnesota, a corporation," as cestui, than it is with a trust on a trust in favor of the Wells Memorial as ultimate cestui. The conduct of the Wells Memorial is presumably within the authorized purposes of the church corporation. At any rate, the burden is on respondent to prove it not to be, since it is respondent who is attacking the validity of the gift. The only difference between the instant case and the Young Men's Christian Association Case is the fact that it is another corporation, the Minneapolis Foundation, rather than an individual, that is made trustee of the corpus. But this distinction goes only to the competence of the trustee, and not to the validity of the trust of the corpus. Should the Minneapolis Foundation be incompetent to act as trustee, the burden of proving which is likewise on respondent, this fact would nevertheless be rendered immaterial by the salutary rule that a charitable trust will not be allowed to fail for want of a trustee. As said in 26 Ruling Case Law, at page 1191: "In the case of charitable trusts as distinguished from private trusts, the general rule is to the effect that if the object of the trust is lawful and sufficiently specific and definite to enable the court to execute it, it will not be permitted to fail for want of a trustee competent to take, but a court of equity will supply one." See, also, In re Kavanaugh's Will, 143 Wis. 90, 126 N. W. 672, 677, 28 L. R. A. (N. S.) 470.

The Young Men's Christian Association Case, supra, is likewise authority for the proposition that the perpetual trust created by Trust No. 2 is not void as a perpetuity. Neither is the living trust void as an accumulation. Congdon v. Congdon, 160 Minn. 343, 200 N. W. 76.

If this court should hold void either the living or the perpetual trust, contrary to what seems the settled law of the state of Minnesota, such holding in a collateral proceeding would not revest in petitioner the trust estate. Neither would it be res adjudicata in a direct proceeding in the state courts joining the trustees and beneficiaries. In short, it is only with the concurrence of the state courts that petitioner could revoke the trusts. And we think that section 219 (g) of the Revenue Acts of 1924 and 1926, dealing with revocable trusts, has reference only to trusts where the grantor *expressly* reserves to himself alone or in conjunction with someone not a beneficiary of the trust the power of revocation. Certainly such a problematical power of revocation as petitioner has by starting proceedings in and obtaining the concurrence of the state courts does not make the trust a revocable one within the meaning of Reinecke v. Northern Trust Co., 278 U. S. 339, 49 S. Ct. 123, 73 L. Ed. 410, 66 A. L. R. 397, or Reinecke v. Smith et al. (C. C. A. 7) 61 F.(2d) 324.

Just how respondent can say that Trusts 2 and 3 can be revoked at any time is not clear to us. The trust agreement provides that if either the living trust or the perpetual trust therein defined be declared void as a trust, then the trust estate shall revert to petitioner if living—otherwise to his heirs, executors, etc. The trust estate which obviously refers to this particular corpus of the trust held void does not revert until it is declared void. Declared void by whom? Evidently it must be

so declared by a competent court. That has never been done and the trust has not been questioned prior to the second stage of this suit. Under present Minnesota statutes it is clearly legal. Mason's Minn. Stats. 1927, sections 8090–8093. The remote possibility that if an action were brought to declare the trust void a court might hold that after Wells' death a part of the trust was invalid is not sufficient to warrant holding that the trust is void. We do not think it is.

### Trust No. 3.

This trust is similar in part to Trust No. 2. It was created December 30, 1922, and designated as being for the benefit of "Wells Memorial and certain annuitants." By it petitioner assigned, transferred, and conveyed to the Minneapolis Trust Company, as trustee, "Certificate No. 2 for 625 shares, par value $100.00 per share, of the six per cent. (6%) cumulative, preferred stock, of the Wells Securities Company," and $3,550 in cash. The trustee's powers of management and of investment and reinvestment, together with the limitations thereon, were the same as in Trusts 1 and 2, above. The income, and as much of the principal as should be necessary, was to be used to pay the net annual premiums upon four policies of life insurance taken out by petitioner on his own life and payable to certain named beneficiaries. The trustee was given full power and authority "to deal with the said Insurance Policies in any manner that it may deem for the best interests of the beneficiaries, and may borrow money thereon, or may avail itself of any of the conditions, privileges or benefits provided by the terms and conditions of the said policies of life insurance."

The four insurance policies referred to were all ordinary life policies of the Massachusetts Mutual Life Insurance Company, of Springfield, Mass., issued November 27, 1922, as of October 21, 1922. Policy No. 591931 was in favor of Annie M. Peavey, relative of petitioner, and provided death benefits in the form of an annuity of $50 a month for the life of said beneficiary. The policy provided that: "If the said beneficiary lives to receive more than 240 monthly payments, there will be paid at the death of said beneficiary, to the executors or administrators of said beneficiary, the commuted value of so many monthly payments, if any, as are necessary to make the total number of monthly payments a multiple of twelve. Payment to the above-named beneficiary is subject to the insured's right, if any, to change the beneficiary hereunder; in the event of such change, only 240 monthly payments (hereinafter called 'the stipulated payments') will be made." It also provided that: "If the death of the beneficiary occurs after the death of the insured, and before all the stipulated payments have been made, the commuted value of the remainder of such payments will be paid in one sum to the executors or administrators of said beneficiary, unless otherwise provided by the insured." And that: "If no beneficiary survives the insured, Nine Thousand and Seventy Dollars, the sum insured, as described above, will be paid in one sum to the executors or administrators of said insured." It also reserved to the insured the power to change the beneficiary and provided that: "None of the payments hereunder shall be commuted, transferred, or encumbered by any beneficiary, except upon the written authority of the insured filed with the Company during his lifetime." The usual rights, powers, and life benefits with respect to dividends, loans, nonforfeiture, and so forth were provided for, and belonged originally to the insured. No provision was made for optional settlement at maturity.

A series of indorsements appear upon the policy. The first of these provides for contingent beneficiaries of death benefits, as follows:

"Springfield, Mass., November 27, 1922. It is hereby provided that in the event of the death of the said Annie M. Peavey, before receiving any or all of the first 240 stipulated monthly installments as herein provided, so many of said 240 stipulated installments as then remain unpaid shall be paid as they become due to Mecca Peavey—relative of the insured—if living, otherwise to Helen R. Golding—valued employee of the insured, if living, otherwise to the Trustees of the Minneapolis Foundation of Minneapolis, Minnesota, without obligation on the part of the Insurance Company to see to the carrying out of the terms of the trust.

"Wheeler H. Hall, Secretary."

By similar indorsement of March 22, 1923, signed by "Albert D. Shaw, Asst. Sec'y.," it was stated that: "The right to make future changes of any beneficiary herein without the consent of the beneficiary or beneficiaries herein, has been specifically surrendered and canceled." Later indorsements acknowledged notification of the death of Annie M. Peavey, first-named beneficiary, with a consequent slight reduction of the premium, and notification of the fact that Helen R. Golding, third-named beneficiary, had become the wife of the insured.

Policy No. 591932 was substantially identical with Policy No. 591931, above, except that Mecca Peavey, instead of Annie M. Peavey, was the first named beneficiary. An indorsement of November 27, 1922, made Annie M. Peavey, Helen R. Golding, and the trustees of the Minneapolis Foundation contingent beneficiaries in the order named. An indorsement of March 22, 1923, stated that the right of the insured to make future changes of any beneficiary without the consent of the beneficiary or beneficiaries had been specifically surrendered and canceled; and a still later indorsement acknowledged notification of the changed status of Helen R. Golding.

Policy No. 591933 was substantially identical with Policies 591931 and 591932, above, except that Helen R. Golding was the first-named beneficiary, and the monthly annuity payable on the death of the insured was $250. An indorsement of November 27, 1922, made the trustees of the Minneapolis Foundation the only contingent beneficiary, and later indorsements of March 22, 1923, and August 13, 1926, acknowledged cancellation of the power to change any beneficiary and notification of the changed status of Helen R. Golding.

Policy No. 591934 was substantially identical with the three policies described above, except that George B. Charnley was the beneficiary, and the monthly annuity payable on the death of the insured was $75. An indorsement of November 27, 1922, made Helen R. Golding and the trustees of the Minneapolis Foundation contingent beneficiaries in the order named, and later indorsements were similar to the indorsements shown to have been entered on the other three policies.

All the policies contained provisions identical except as to amount with the provisions quoted above in connection with Policy No. 591,931 for lump-sum settlement to the executors or administrators of the insured in the event of all the beneficiaries dying before exhaustion of the payments due.

By the terms of the trust, all income in excess of that necessary to pay the net annual premiums on the above policies of insurance was to be accumulated "to pay life insurance premiums in years when the trust estate shall not produce sufficient income." Petitioner further provided that:

"In the event that during my life the premiums on all of the four policies named in Paragraph Numbered Three (3) shall cease to be demanded or paid, by reason of the fact that all of the beneficiaries named under the four policies shall predecease me, or by reason of some act of the Trustee under the discretionary powers granted in Paragraph Two (2), then, and in that event, the Trustee shall forthwith deliver over to the Minneapolis Foundation, a corporation organized under the laws of Minnesota solely for benevolent and charitable purposes, with principal place of business in the city of Minneapolis, in said State, the entire trust estate then in its possession, which delivery shall be made in like manner as herein provided to be made upon my death.

"Upon my death, or upon the happening of any contingency named in Paragraphs Two (2) or Six (6), which defeat the purpose of the trust, the entire trust estate with the accumulations, if any, shall be delivered over to the said Minneapolis Foundation, to be by the said Minneapolis Foundation used in accordance with the terms of the following trust.

"I presently give, grant and convey in perpetuity unto the said Minneapolis Foundation, the trust estate heretofore created, and its accumulations, if any, existing and remaining in the possession of the said Minneapolis Trust Company at the date of my death, or at the time of death, or at the time of the occurrence of the other conditions herein named, not for its own use and benefit, however, but upon the trust hereinafter defined."

Further provisions, applicable to both the living and the perpetual trusts thus created, were identical with those set forth under Trust No. 2, above. The income of the perpetual trust was payable on exactly the same conditions to the "Rector, Wardens and Vestrymen of St. Marks Church, in Minneapolis, Minnesota, a corporation."

It is to be noted that no express provision is made empowering the trustee to collect and pay over the proceeds of the policies of insurance on the death of the insured. The policies remained payable, as annuities, to the beneficiaries who should survive the insured; and only in the event of all the named beneficiaries of each particular policy dying before the 240 stipulated monthly payments had been exhausted would any part of the proceeds of that policy go by way of lump-sum settlement to the insured's estate. But this contingency would seem in the nature of things not likely to occur, since as to each policy the last-named contingent beneficiary is the Minneapolis Foundation, a corporation, whose decease can only be brought about by

its voluntary or involuntary dissolution, an hypothesis not to be presumed.

We refer to some statements of respondent's supplemental brief. It is there said: "Under Trust No. 3 no express provision is made in the trust instrument for the disposition of benefits payable under the policies in case the beneficiaries predeceased Wells 'or if for any other reason payments on said policies shall cease to be demanded or paid.'" The instrument creating Trust No. 3 provides: "Upon my death, or upon the happening of any contingency named in Paragraphs Two (2) or Six (6), which defeat the purpose of the trust, the entire trust estate with the accumulations, if any, shall be delivered over to the said Minneapolis Foundation, to be by the said Minneapolis Foundation used in accordance with the terms of the following trust," which shows that explicit provision is made for the disposition of benefits if the beneficiaries predecease Wells. This statement occurs: "The four policies themselves (Ex. pp. 32–44) provided that upon the death of Wells * * * and if no beneficiary survived the insured a fixed amount was to be paid in one sum to Wells' estate." This overlooks the indorsement on the first page of each policy of provisos naming contingent beneficiaries and naming as the last contingent beneficiary the Minneapolis Foundation, a corporation.

At pages 26, 27 of its supplemental brief respondent argues as follows: "But the Foundation is entitled only to receive the balance of the 240 payments not theretofore paid to the first or other preceding beneficiary. It does not appear that naming the Foundation as beneficiary does away with the requirement of each policy that if no beneficiary survives the insured the commuted value of 240 payments shall be paid to the estate of Wells. In other words, the Foundation is only to receive what one of the living beneficiaries would have received during the rest of her life had she continued to live. One beneficiary, Annie Peavey, has already predeceased Wells (Ex. 34) and it does not appear that the others (who were aged 38, 58, and 62 when the policies were taken out (Ex. 36, 39, 42) have not also predeceased him. Thus Wells' estate may already have become or may later become the beneficiary of the policies under Trust No. 3."

We do not see how this follows. The lump-sum settlement that is to be made to the estate of Wells in the event of the beneficiaries named not exhausting the stipulated 240 payments is not an amount over and above the amount of the 240 payments; rather it is to be the commuted value of the balance of said payments left unpaid. And so long as the Minneapolis Foundation may receive this balance as a beneficiary the provision for lump-sum settlement, though of course not done away with, is nevertheless rendered inapplicable. It therefore follows that the estate of Wells will not become the beneficiary of the policies so long as the Minneapolis Foundation endures.

All further considerations applicable to Trust No. 3 have been dealt with under Trust No. 2, above, and its income, like the income of Trust No. 2, is no more income to the petitioner than the income of Trust No. 1.

### Trust No. 4.

The instrument creating this trust designated it as being for the benefit of Thomas Bucklin Wells, Frank Hutchison Peavey Wells, Frederick Brown Wells, Jr., and Mary Wright Peavey Wells, children of petitioner, and was executed August 6, 1923. By it petitioner assigned, transferred, and conveyed to the Minneapolis Trust Company, as trustee, "Certificate No. 16 for 1000 shares of the six percent cumulative preferred stock of The Wells Securities Company, a Delaware corporation, said stock being of the par value of $100.00 per share." The trustee's powers of management and of investment and reinvestment, together with the limitations thereon, were the same as in Trusts 1, 2, and 3. The income, and as much of the principal as should be necessary, was to be used to pay the net annual premiums upon policies of life and accident insurance taken out by petitioner, the trustee "having been irrevocably designated as the beneficiary of the life insurance policies, and as beneficiary of the death benefit recoverable under the accident insurance policies." The trustee was given full power and authority "to deal with said Insurance Companies and with the said insurance, in any manner that it may deem for the best interests of the beneficiaries, and may borrow money thereon, or may avail itself of any of the conditions, privileges or benefits provided by the terms of the said policies of life insurance."

Ten policies of life and three of accident insurance are involved in this trust. It seems unnecessary to particularize as to these different policies. It would extend this opinion to indefensible lengths. Some were payable to Mary D. Wells upon petitioner's death, if living, and otherwise to her executors, administrators, or assigns. One was payable to petitioner's mother, but the beneficiary therein was changed to the insured's estate and to

Mary D. Wells. The plans of some of these policies were changed, but the sum total of the matter is that all of them had been irrevocably assigned to the trustee at the time of the execution of the trust instrument of August 6, 1923, except one, and the statement in that instrument that all had been assigned was an error as to Policy No. 679B. Ex of the State Mutual Life Assurance Company. At that time Mary D. Wells had made no assignment as to that policy and petitioner had no interest to assign. However, on February 14, 1924, Mary D. Wells released the assignment to her and the interest then reverted to petitioner, and redounded immediately by virtue of the provisions of the trust instrument, and in accordance with well-known rules of law, to the Minneapolis Trust Company. Any defect in the title or interest which the Minneapolis Trust Company secured was cured by the assignment to it of all possible interest in the policy made the same day in which Mary D. Wells joined. Therefore this misstatement in the trust instrument is immaterial. The death benefits of said policies, originally payable to Mary D. Wells, if living, otherwise to petitioner's estate, were made payable to the Minneapolis Trust Company, as trustee. It does not appear whether such change in the beneficiary of death benefits was made irrevocable. Unless assigned by the terms of the trust instrument, disability benefits remained payable to petitioner.

The only considerations raised by respondent under Trust No. 4 that have not already been dealt with under Trusts 1, 2, or 3 are the effect of the limitation over to the children's heirs in accordance with the Minnesota statute of distributions, and the effect of the inclusion in the trust of the policies of accident insurance whose disability benefits evidently have remained payable to petitioner. As to the first consideration respondent argues that under the Minnesota statute a father may inherit from his children, and thus it follows that petitioner "may ultimately receive the entire corpus of this trust, both the original corpus and the proceeds of the policies."

Now obviously petitioner will never inherit the proceeds payable at death on policies of insurance on his own life. And we have already considered, under Trust No. 1, the possibility that exists regardless of an express provision to that effect, viz., that in the event of petitioner's children all predeceasing him the trust estate may revert to him either as grantor, for want of cestui, or as heir of his children. We there held such a possibility not to constitute property in a

present taxable sense, citing Coolidge v. Long and Reinecke v. Northern Trust Co., both supra, and not to constitute a present benefit in the sense of income. The same result follows here.

■ We regard the policies of accident insurance as "policies of insurance on the life of the grantor" within the meaning of section 219 (h) of the Revenue Acts of 1924 and 1926 (26 USCA § 960 note). They are certainly "policies of insurance" and are "on the life of the grantor" as much as any other kind of insurance policy carrying death benefits. They are simply of narrower scope as regards the cause of death. Premiums paid thereon do not constitute money saved, as in the case of life insurance, nor give the policy a cash surrender value, yet are presumably paid for their equivalent of protection in case of death or disability.

■ In the instant case it does not appear except from the recitation in the trust instrument that the death benefits of the above policies of accident insurance were irrevocably made payable to the Minneapolis Trust Company. Nor can we say from the terms of the trust instrument, and it does not otherwise appear, that the disability benefits were in any way assigned so as to cease to be payable to petitioner himself. It therefore follows that petitioner has conveyed away property on the understanding that a part of the income therefrom is to be used to keep in force contracts by which in the event of his disability he will receive definite payments thereunder. For the tax years here in question a part of the income was so used. It follows that petitioner was enriched during those years in a definite pecuniary sense to the extent at least of the value of the disability contracts. This being so, the instant case is assimilable as regards the premiums paid on the policies of accident insurance to the cases in the Board of Tax Appeals of Danforth v. Commissioner of Internal Revenue, 18 B. T. A. 1221, and Adams v. Commissioner of Revenue, 18 B. T. A. 381, and fall within the proper scope of Old Colony Trust Company v. Commissioner of Internal Revenue, 279 U. S. 716, 49 S. Ct. 499, 73 L. Ed. 918; United States v. Boston & Maine R. R., 279 U. S. 732, 49 S. Ct. 505, 73 L. Ed. 929; and United States v. Mahoning Coal R. Co. (C. C. A.) 51 F.(2d) 208. Such premiums may therefore be constitutionally taxed to the grantor under section 219 (h) of the Revenue Acts of 1924 and 1926; and if Congress did not intend to include them within the scope of that section, they may nevertheless

be taxed to petitioner in the instant case as the real beneficiary of the trust for their payment, under section 219 (b) of the same acts (26 USCA § 960 note).

### Trust No. 5.

Trust No. 5 will be found to be no different on its facts from Trust No. 4, and therefore assimilable to the same rules. It is for the benefit of the same children of petitioner. By it petitioner assigned, transferred and conveyed to the Minneapolis Trust Company, as trustee, "Certificate No. 17 for 100 shares of the six percent cumulative preferred stock of the Wells Securities Company, a Delaware corporation, said stock being of the par value of $100.00 per share." The trustee's powers of management and of investment and reinvestment, together with the limitations thereon, were the same as in Trusts 1, 2, 3, and 4, above. The income of the trust estate, and so much of the principal as should be necessary, was to be used to pay the net annual premiums upon nine policies of life insurance, and three policies of accident insurance, taken out by petitioner, the trustee having the same powers as in Trust No. 4.

January 29, 1921, by separate assignments, under seal and acknowledged and duly approved, petitioner assigned all his right, title, and interest to these policies to Mary D. Wells; and Mary D. Wells by assignments of May 1, 1923, assigned the same to the Minneapolis Trust Company. In June, 1923, petitioner acknowledged separately as to each assignment thus made to the Minneapolis Trust Company by Mary D. Wells, "that I have previously assigned to Mary Drew Wells all my right, title and interest in and to said policy, that I have no right to object to the above assignment nor wish to do so."

As to all the policies the assignments were complete as regards petitioner. He retained no interest in nor control over them. This statement may be made without specifically pointing out the various steps in the assignments of the policies and the changes and releases of beneficiaries.

A similar question arises here as in Trust No. 4 as to the accident policies, which were substantially identical with the policies there included.

As of August 10, 1927, the trustee relinquished Accident Policy No. DWB 5168 of the Connecticut General Life Insurance Company, and substituted a policy of the Standard Accident Insurance Company of Detroit, Mich. The application therefor directed that death benefits be made payable to the Minneapolis Trust Company, as trustee. In all three accident policies disability benefits presumably remained payable to petitioner himself.

Under the terms of the trust instrument, any income in excess of the amount necessary to pay the net annual premiums on the above policies of life and accident insurance was to be accumulated until sufficient to pay two successive net annual premiums upon all of said policies, "any accumulations in excess of which amount shall be distributed between my children, herein named as beneficiaries, in the proportion in which they shall ultimately receive the incomes from the trust estate, and in the event that any accumulation provided for herein shall be held invalid for any reason, such accumulation shall be distributed in the same manner." As in the instrument creating Trusts No. 1 and No. 4, petitioner provided that upon his death the trustee should use the insurance money to buy securities from his estate at the appraised valuation. The same provisions for disposition and termination that were provided for in Trust No. 4 are also found here.

It thus appears that as regards both the life insurance and the accident insurance policies and the terms of the trusts, Trust No. 5 is in no way distinguishable from Trust No. 4. Except as regards the accident policies both are assimilable to the situations already found present as to Trusts 1, 2, and 3, and the law found to be applicable thereto. All of these trusts irrevocable in their nature were created prior to the enactment of section 219 (h), supra. That act was intended to be retroactive and to reach irrevocable as well as revocable trusts. In applying it to the situation here presented, it taxes as income of petitioner something that is not his income and that in no way enriches him except as to the premiums paid on the accident insurance policies in Trusts 4 and 5.

The decision of the Board of Tax Appeals is in our judgment incorrect as to Trusts 1, 2, and 3, and correct as to Trusts 4 and 5 only as to the amounts used to pay premiums on the policies of accident insurance included in these trusts. As to Trusts 1, 2, and 3 the order of the Board of Tax Appeals is reversed. As to Trusts 4 and 5 it is modified as herein indicated, and the cause is remanded for further proceedings not inconsistent with this opinion.