**SAMPSON v. WELCH, Formerly Collector of Internal Revenue.**

No. 7317–S.

District Court, S. D. California, Central Division.

April 30, 1938.

276

Frank Mergenthaler, of Los Angeles, Cal., for plaintiff.

Ben Harrison, U. S. Atty., and E. H. Mitchell, Sp. Asst. U. S. Atty., and Alva C. Baird and Eugene Harpole, Sp. Attys. for the Treasury Department, all of Los Angeles, Cal., for defendant.

JENNEY, District Judge (after stating the facts and summarizing the arguments as above).

This case raises a number of questions which have been perplexing the federal courts, the California courts, and legal commentators for years.[1] The issue at bar necessitates first a general determination as to the nature of the change which the adoption of section 161a effected in the wife's interest in community property in California. This court must next decide whether the wife's rights over such property are sufficient to prevent the inclusion of her share as a part of her deceased husband's gross estate, under the provisions of either section 302(a) or 302(b) of the applicable federal estate tax statute, the Revenue Act of 1926, 44 Stat. 70, 26 U.S.C.A. § 411(a, b). Finally, the court must determine whether a written though informal conveyance—from a husband to a wife of such property rights as are

[1] See, inter alia, the following: History of the problems, McKay, Community Property, Chaps. 3, 47; 65–71; 19 Cal.L. Rev. 567; Cum.Bull. III–1, p. 92. Nature of Community Ownership: 35 Harv.L.Rev. 47; 19 Calif.L.Rev. 567; 22 Calif.L.Rev. 404; 7 So.Calif.L.Rev. 1; 4 Cum.Bull., p. 238; Cum.Bull. IV–1, p. 19; Cum.Bull. III–1, p. 92. Application to tax questions: 14 Calif.L.Rev. 351 and 441; 39 Harv.L.Rev. 762; 44 Harv.L. Rev. 652.

necessary to make her the owner of a present, existing and equal interest in all their property—is a taxable transfer within the provisions of section 302(c) or 302(d) of the same Revenue Act, 44 Stat. 70, 71, 26 U.S.C.A. § 411(c, d).

The difficulties incident to such problems are not altogether new. Some of the obstacles presented are those which have confronted all common-law judges who have attempted to analyze civil law concepts with common-law methods of thought. See opinion of Attorney General Harlan F. Stone, C.B. IV–1, at p. 25; 35 Harv. L.Rev. 47 at 66. Then, too, the attitude of the federal court that it should accept the state courts' definitions on such matters (U. S. v. Robbins, 269 U.S. 315, at page 326, 46 S.Ct. 148, 70 L.Ed. 285; Warburton v. White, 176 U.S. 484, at page 496, 20 S.Ct. 404, 44 L.Ed. 555) may handicap it because of conflicting or vague decisions, or because there are almost no state decisions to follow. This is precisely the situation we encounter when we try to interpret section 161a. In such a case the federal court can only decide the matter on the basis of what it believes the state court will ultimately and authoritatively declare. But the perils of such a course are obvious and painfully real, as witness the fate of the decision in Wardell v. Blum, 9 Cir., 276 F. 226, where the circuit court's conception of the California law was declined by the California Supreme Court in Stewart v. Stewart, 199 Cal. 318, at page 342, 249 P. 197. That situation does not, however, relieve this court of its immediate responsibility.

The problems presented here have likewise taxed the ingenuity and patience of the Attorney General and the Treasury Department, as may be seen from a brief review of the efforts of those governmental agencies to draft consistent tax policies as to California community property. On February 14, 1917, T.D. 2450 recognized that in Texas, one-half of the common estate belonged to each spouse, and indicated that if a wife could establish by evidence the community character of the property, it was includible only to the extent of one-half thereof in a deceased husband's gross estate. This ruling was based upon state authorities holding that the interests of spouses in community gains were equal, even though the husband retained management and control. Thereafter, on August 24, 1920, Attorney General Palmer, in an opinion addressed to Secretary of the Treasury Houston, ruled that community income was divisible between the spouses of Texas, and, as such, was reportable one-half by the wife and one-half by the husband (3 C.B. 221). On March 3, 1921, T.D. 3138 (4 C.B. 238), based on a detailed examination of state statutes and decisions in another opinion by the Attorney General, declared that in all community property states except California, not only could income be reported one-half by each spouse, but that the half interest of the wife, being vested, was not properly includible for estate tax purposes in the deceased husband's gross estate. By T. D. 3569, dated March 27, 1924 (C.B.III–1, 92) this rule was extended to include California, as to both income and estate taxes. This latter ruling, resting on the decision in Wardell v. Blum, 9 Cir., supra, was shortly thereafter withdrawn for further consideration (T.D. 3596; C.B. III–1, 101). Then T.D. 3670 issued on February 7, 1925 (C.B. IV–1, 19), restored the former holding of T.D. 3569 in so far as it related to estate tax, but declined to reinstate it as to income tax; the government apparently intending to secure an answer to the latter question by prosecuting litigation through to the United States Supreme Court. This was actually done, and the decision in United States v. Robbins, 269 U.S. 315, 46 S.Ct. 148, 70 L.Ed. 285 determined the matter against the taxpayer, holding that husbands and wives in California could not divide community income for federal income tax purposes. Following this case and taking into consideration the decision of the California Supreme Court in Stewart v. Stewart, supra, the Treasury Department by T.D. 3891 (C. B. V–2, p. 232) withdrew its former expressions of policy and declared that in computing a California decedent's gross estate for tax purposes, there should be included all of the community property. This view was indorsed in Talcott v. United States, 9 Cir., 23 F.2d 897. Thus the problem was apparently settled, although in so doing a rule was adopted with regard to California which conflicted with that approved for other community property states.

Meanwhile the Legislature of California had made certain changes in the community property laws by the amendments of 1923 and 1927. These changes induced new efforts by taxpayers to bring California into line with the rule of other community

property states. As a result the Supreme Court of the United States in United States v. Malcolm, 282 U.S. 792, 51 S.Ct. 184, 75 L.Ed. 714, answering certain questions certified to it by the Circuit Court of Appeals for the Ninth Circuit, 47 F.2d 1087, declared that a wife has, under section 161a of the Civil Code of California, such an interest in the community income that she should separately report the same and pay tax on one-half thereof. Although the question was asked and answered as above, the court without comment referred to the cases of Poe v. Seaborn, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239; Goodell v. Koch, 282 U.S. 118, 51 S.Ct. 62, 75 L.Ed. 247, and Hopkins v. Bacon, 282 U.S. 122, 51 S.Ct. 62, 75 L.Ed. 249, dealing with a similar problem in other community property states. In these cases, there was a strong intimation that the interest of the wife was reportable separately because it was vested, as determined by the prevailing decisions of the respective state courts. No such pronouncement has as yet issued from the Supreme Court of California.

Thus while California spouses are permitted to divide their income from community property under the prevailing rule, the related question as to what may be done in computing estate taxes is still open. The current practice of the Treasury Department, as admitted by the government— though not supported by any official ruling—is to consider that the wife's interest in community property acquired after July 29, 1927, is not includible in the deceased husband's estate. But there is no authoritative decision to which this court can refer summarily. Accordingly, a full consideration of all the problems seems to be required.

Fully conscious of these difficulties, the court in the case at bar turns first to the problem of the precise effect of this concededly valid agreement of May 23, 1929, in an effort to ascertain the definite characteristics of the property interest, if any, which passed as a result of it. Once we have defined the quantity and quality of that interest, we may then properly consider whether it falls within the provisions of the federal estate tax statute.

█ It will be noted that this agreement closely follows the wording of section 161a. It was the apparent intention of the parties by that instrument—and the court finds that it was the actual effect thereof—that Mr. Sampson transferred to Mrs. Sampson such an interest in all their property, previously acquired, as would have accrued to her under section 161a had such property been community property acquired after the passage of that statute. If this section made no substantial change in the rights which a wife might legally enjoy over community property, obviously the agreement made no substantial alteration in the rights which Mrs. Sampson was to enjoy. If, on the other hand, section 161a did make material changes in the rights of the wife, then the agreement effectively executed a similar rearrangement of the Sampsons' marital property rights. The basic question therefore is: What was the effect of section 161a?

It should be noted that both section 161a and the agreement incorporate by reference the provisions of sections 172 and 172a of the California Civil Code which deal with the management and control of community property. These sections are as follows:

"§ 172. *Management of community personal property.* The husband has the management and control of community personal property, with like absolute power of disposition, other than testamentary, as he has of his separate estate; provided, however, that he cannot make a gift of such community personal property, or dispose of the same without a valuable consideration, or sell, convey, or encumber the furniture, furnishings, or fittings of the home, or the clothing or wearing apparel of the wife or minor children that is community, without the written consent of the wife."

"§ 172a. *Management of community real property. Limitation of actions.* The husband has the management and control of the community real property, but the wife, either personally or by duly authorized agent, must join with him in executing any instrument by which such community real property or any interest therein is leased for a longer period than one year, or is sold, conveyed, or encumbered; provided * * * also, however, that the sole lease, contract, mortgage or deed of the husband, holding the record title to community real property, to a lessee, purchaser or encumbrancer, in good faith without knowledge of the marriage relation shall be presumed to be valid. No action to avoid any instrument mentioned in this section, affecting any property standing of record in the name of the husband alone,

executed by the husband alone, shall be commenced after the expiration of one year from the filing for record of said instrument."

Prior to the passage of section 161a, a wife's property interest in the community amounted to a mere expectancy. Stewart v. Stewart, 199 Cal. 318, 249 P. 197. But continued efforts were made to elevate her status to that of the holder of a "vested" interest. The matter was carried to the California Legislature, where consideration was given to the entire subject. The result was section 161a.

■ The legislators naturally were fully informed as to the course of legal events in connection with the question of community ownership as heretofore outlined. And yet, in spite of all the pressure that was brought to bear in favor of declaring that the wife had a "vested interest" in the community, the Legislature refrained from using those magic words. It may be that it used and intended to use words supposedly meaning the same thing; but in the light of what had gone before, such an interpretation is at least strained. Is it not more reasonable to assume under the circumstances that the Legislature consciously avoided the use of the word "vested"?

As yet there has been no decision from the Supreme Court of California holding that, as a result of section 161a, the wife's interest was expanded into a "vested interest." The Supreme Court of the United States has not said so. The most it held by its decision in United States v. Malcolm, supra, was that the wife had an interest sufficient to permit a division of the community income for tax purposes.

In view of the foregoing, this court cannot feel justified in declaring that the wife now has a "vested" interest, within every possible meaning that can be ascribed to the word "vested," even if the court believed that such a determination would be the proper foundation upon which to build its decision in this case. It cannot feel, however, that designating the wife's interest as "vested" would either materially allay the confusion or do justice to legislative efforts to deal with the problem. In the first place, no one seems to be quite sure what the term "vested" means, as used in this connection. Certainly, it cannot connote that which its use ordinarily suggests when applied to common-law estates. Many of the characteristics there implied are here expressly negatived by

civil law tradition or legislative enactment. See C.B. IV–1, p. 24, opinion of Attorney General Harlan F. Stone, dated October 9, 1924. As was pointed out in Spreckels v. Spreckels, 1897, 116 Cal. 339, 48 P. 228, 36 L.R.A. 497, 58 Am.St.Rep. 170, if a husband can alienate, surely there is no vested right in one common-law sense. It is no more satisfying to label a wife's interest in community property "vested" than it is to liken her interest to that of a joint tenant, a partner, a tenant in common, or by the entireties. In some respects, such a comparison would be correct; in others, patent differences and inconsistencies would raise dissatisfying doubts.

As was said by Mr. Justice Stone when, as Attorney General, he rendered the opinion, supra: "The confusion in the decisions of the California courts has undoubtedly arisen from the fact that the courts have been attempting, in their opinions, to apply the terminology of the common law to community property, which embodies a legal concept wholly foreign to the common law, and to which the terminology of the common law cannot be applied with accuracy and precision. * * * The common law terms may be resorted to to describe the incidents of community property in some aspects, but are wholly inappropriate to describe them for other purposes."

A name such as "vested," used to designate a property interest, is not helpful in classifying the estate (or for that matter, any legal concept) unless the characteristics of the estate (or the limits of the concept) are so well understood as to assist, rather than impede, identification. Here the precise characteristics of vestedness, as used in this special field, are speculative at best. None have been adduced by counsel. To declare an interest nontaxable because it is vested, when the only consequence claimed to flow from vestedness is nontaxability, is to resort to question begging.

■ This court must look through verbiage to essential nature; it must scrutinize all the legal characteristics of the estate or property interest here involved, and the legal consequences flowing from each characteristic. In determining the incidence of this federal tax, it must not only interpret the scope and effect of the federal taxing statute, but it must also, because of the confusing state of the California law, form its own judgment on the

legal nature and character of the object of the tax, even though such object is the creation of state laws. However, neither state courts nor Legislatures, by giving the object a particular name or by using some formula of words, can take away from the federal court the duty of considering its real nature. Iowa Loan & Trust Co. v. Fairweather, D.C., 252 F. 605; Choctaw, O. & G. R. Co. v. Harrison, 235 U.S. 292, 35 S.Ct. 27, 59 L.Ed. 234.

What, then, did section 161a accomplish as to the title of the wife in community property to be acquired after its effective date? While the statute says it is intended to define the interests of the spouses and does not say that it is designed to enlarge the wife's interest, the view that the former was the only intent of the statute (16 Calif.Law Rev. 68) has been definitely overruled. Stewart v. Stewart, 204 Cal. 546, at page 555, 269 P. 439. See 22 Calif. Law Rev. 417. It will be noted that this section did not alter the situation in regard to management and control, since it incorporated by reference the provisions of section 172 and 172a. All it did was to enlarge the legal ownership of the wife in community property. The Legislature was obviously trying to emphasize the distinction between ownership—divided now equally between the spouses—and management and control—powers vested in the husband as some sort of agent for the owners. See opinion of Mr. Justice Holmes in Arnett v. Reade, 220 U.S. 311, 31 S.Ct. 425, 55 L.Ed. 477, 36 L.R.A.,N.S., 1040.

A consideration of the words of the statute impels one to the conclusion that the Legislature intended to give the wife something more than the expectancy she already had. Formerly she had but an anticipatory interest; now it is "present and existing." Previously, her titular rights were subordinate to the husband's; now they are "equal."

It is the firm belief of this court that, giving to the words of section 161a the only meaning which can avoid nullity and which will give a reasonable significance to all of the words of the statute; one must conclude that by "a present interest" the Legislature referred to the present enjoyment of ownership and not to the present enjoyment of possession. The Legislature must have wanted to endow the wife in the present with rights of ownership which would be more than merely expectant but would be existent—such that they would not be subordinate but equal to the husband's. The possession, management, and control, and the right to alienate or hypothecate, remained solely in the husband; the bare legal title, the right of ownership as now defined, was divided equally between the spouses.

It has been suggested by counsel that this interpretation of the wording of section 161a conflicts with section 689 of the Civil Code, which says: "Present interest, what. A present interest entitles the owner to the immediate possession of the property."

It is to be noted, however, that section 689 was designated to distinguish a present interest from a future interest, which in section 690 is described as entitling "the owner to the possession of the property only at a future period." Since section 161a specifically incorporated the provisions of sections 172 and 172a, the Legislature clearly had no intention of giving the wife present control, management, or possession of the community. It did, however, intend, unless its words be meaningless, to bestow upon her a present share of the ownership, as distinguished from control, and to make her rights in that regard coexistent with and equal to those of the husband.

The fact that her interest as created and defined in 161a does not fall within any of the better known common-law categories of estates is immaterial. Burnet v. Wells, 289 U.S. 670, 53 S.Ct. 761, 764, 77 L.Ed. 1439, 12 A.F.T.R. 65, Ct.D. 688, C.B. June 1933, p. 261, reversing Com'r of Int. Rev. v. Wells, 8 Cir., 63 F.2d 425, 12 A.F. T.R. 198, per Mr. Justice Cardozo. It may be that the California Legislature has here created a new estate. 22 Calif.Law Rev. 418; 17 Calif.Law Rev. at pages 13 and 17. If so, this court has no right to distort its conformation by trying to squeeze it into the constricting limits of common-law verbiage or concept. The fact that these characteristics of the wife's wraithlike interest—present, existing, and equal to the husband's—do not permit classification as a joint tenancy, a tenancy in common, or even in every possible sense, as a "vested" interest, is beside the point when we are considering federal taxation. When Congress has the right to subject a property interest or an aspect of ownership to liability for taxes, it is by no means confined or limited to the more generally recognized historical estates. As Mr. Justice Cardozo remarked in Burnet v. Wells, supra: "Gov-

ernment in casting about for proper subjects of taxation is not confined by the traditional classification of interests or estates. It may tax, not only ownership, but any right or privilege that is a constituent of ownership."

With these principles in mind, let us then consider, first, section 302(a) of the Estate Tax Act, 26 U.S.C.A. § 411(a), which provides that the gross estate of a decedent shall be determined by including therein the value of all property, real or personal, wherever situated, to the extent of the interest of the decedent therein at the time of his death. In the light of what has been said heretofore as to the interest which Mrs. Sampson had in all their community property, it must be apparent that she had a legal and present share in the ownership thereof, coexistent with and equal to the share belonging to her husband. ·For the purpose of this section, it is immaterial whether she acquired such an interest by virtue of the agreement or by virtue of section 161a of the Civil Code. Suffice it to say that such a one-half interest—even though undivided and essentially dissimilar from all recognized common-law estates—cannot be ignored, or treated as if it were the husband's, when it clearly is not. Consequently, it cannot be taxed to him under section 302(a), as if it were his interest and not that of his wife.

This conclusion is re-enforced by a consideration of the provisions of section 201 of the Probate Code of California, formerly section 1401 of the Civil Code, which are: "Upon the death of either husband or wife, one-half of the community property belongs to the surviving spouse; the other half is subject to the testamentary disposition of the decedent, and in the absence thereof goes to the surviving spouse, subject to the following provisions."

Section 202 subjects all community property passing from the control of the husband, by his death or otherwise, to administration, to his debts, and to certain other charges. This is a provision more or less typical of the law in all community property states and should be construed as correlative to the principle that during the husband's life the community property is subject to his debts. Both are apparently corollaries to his right of management and control.

It is significant that under section 201, one-half of the community property does not go to the wife upon her husband's death, but belongs to her. So sharp a difference in wording cannot be ignored. Construing section 201, adopted in 1923, together with section 161a, adopted in 1927, this court must conclude that the Legislature intended that the wife's interest, bestowed upon her by the latter act, should remain in her—should belong to her—without the limitations upon management and control, now removed by the spouse's death, and without passing into or becoming a part of the decedent's estate for any purpose other than as specified in section 202.

The wife's interest under section 161a exists during her husband's lifetime. His death merely lifts the restrictive limitations to which it was subject under sections 172 and 172a, except in so far as section 202 subjects it to his debts. On his death, the property interest belongs to the wife, not to the husband's estate. Consequently, it cannot be included in his gross estate in computing estate taxes.

This is the reasoning of Hernandez v. Becker, 10 Cir., 54 F.2d 542, 547, which dealt with New Mexico statutes declaring that on the death of the wife all community property belongs to the husband, and that on the death of the husband, one-half of the community property goes to the wife. Hence, when the wife dies, none of the community property is includible within her estate as a basis for taxation, since all of it has passed directly to the husband. On the other hand, when the husband dies all of the community property is subject to his estate tax, because one-half of it goes to the wife but none of it (as in California) belongs to her. Applying the reasoning of the judges in the New Mexico case to the situation at bar, it is clear that under section 302(a) that portion of the community property belonging to the wife upon the death of the husband cannot be held to be within the deceased husband's taxable estate.[2]

---

[2] Counsel for the government contends that, regardless of the foregoing, the taxpayer has failed to overcome the presumptive correctness of the Commissioner's finding that the wife's share in the community property was includible in decedent's gross estate under section 302 (a). No specific reason for the Commissioner's determination appears in the record. Whatever it may have been, the court believes that the finding was erroneous as a matter of law. This is so

282

■ The second of the government's main arguments is based on the provisions of section 302(b) of the Revenue Act of 1926, supra. Counsel for the Collector vigorously urge that the community property system was introduced into the law of California as a statutory substitute for the common-law estates of dower and curtesy. An early and oft-quoted dictum in Beard v. Knox, 5 Cal. 252, at page 256, 63 Am.Dec. 125, seemingly expresses this view. The Chief Justice in that case said: "Our statute has done away with the common law right of dower, and substituted in place, a half interest in the common property."

The Circuit Court of Appeals for this Circuit has referred to that dictum in Talcott v. United States, 23 F.2d 897, wherein it was decided that all the community property, including the wife's share, ought to be computed as part of the deceased husband's gross estate. That detailed opinion dealt, however, with facts arising before the amendments to the Civil Code of 1923, section 1401, now section 201 Probate Code, and 1927, section 161a, which have materially altered the situation. Cf. United States v. Robbins, supra, with United States v. Malcolm, supra. On that ground, the Talcott Case may be distinguished, for in the property there involved, the wife had only an expectant interest which went (not belonged) to her after her husband's death, 16 Calif.Law Rev. 244. In view of what this court believes was the effect of these statutory changes, the Talcott Case can no longer be deemed controlling. In order to clarify this matter, may we call attention to the historical background of the California community property law.[3]

When the Treaty of Guadalupe Hidalgo in 1848, 9 Stat. 922, terminated the old sovereignty, a clause therein provided that the Mexicans within the territory of California should be maintained in free enjoyment of their property. The California Constitutional Convention of 1849 endeavored to give practical effect to the treaty commitments, and provided that "laws shall be passed more clearly defining the rights of the wife, in relation as well to her separate property, as to that held in common with her husband." Constitution 1849, art. 11, § 14. Pursuant to this constitutional mandate, the Legislature in the Act of April 17, 1850, defined common property as "all property acquired after the marriage by either husband or wife, except such as may be acquired by gift, bequest, devise, or descent." § 2. Concurrently there was adopted a definition of separate property, both as to husband and as to wife. The Legislature, having thus made adequate provision for the wife, saw no need for endowing her with any further or different rights—such as might accrue to her under the common-law doctrines of dower. The Legislature accordingly declined to import into the new country the traditional estates of dower and curtesy. Statutes of 1850, p. 254, § 10, now section 173 of the Civil Code. Here was an anomalous situation, preserving intact certain doctrines of an alien jurisprudence at the same time that the common law was imported bodily as to other matters—yet it was a compromise dictated by a desire to do justice to the pre-existing property rights.

Granted that the community property system is wholly now a creature of statute, it must be remembered that the statute did not abolish the common-law estates and replace them with civil-law doctrines. What was actually done was to continue in effect a different method of providing for the wife or husband from that in effect under the common law. The community property doctrine was merely allowed to remain in lieu of any attempt to introduce dower or curtesy or any other provision for an estate in the surviving spouse, except that provided for in the homestead laws.

On January 1, 1873, when the Codes went into effect, the relation between the common law and civil law system, worked out in 1850, was continued practically un-

whether it was predicated on a belief that the wife had no more than a mere expectancy—so that the husband's interest amounted to full ownership of all community property—or whether it was based on the thought that the husband's rights of management and control over the wife's share gave him such an interest therein as would be taxable under section 302(a). Since we hold that such rights are not taxable, their value becomes immaterial; so likewise does the question of the burden of proof thereof.

[3] For summary studies of the history and development of the community property concepts, see McKay, Community Property, 2nd Ed., Chap. 1, 19 Calif. Law Rev. 567; Robbins v. U. S., D.C., 5 F.2d 690. Citations to more detailed materials are made available in each of the foregoing.

changed. Subsequent statutory amendments, including section 161a, have readjusted the relative rights of husband and wife in regard to community property, but such statutory changes have in no way made the community property system a substitute for dower and curtesy. To say that the community property concepts were introduced into California jurisprudence by statute in lieu of dower would, it seems to the court, distort historical fact, and would put an unwarranted interpretation upon the words of the Revenue Act of 1926.

These conclusions are amply supported by authority. In the early case of Packard v. Arellanes, 17 Cal. 525, at page 537, the Court said: "Our whole system by which the rights of property between husband and wife are regulated and determined, is borrowed from the civil and Spanish law, and we must look to these sources for the reasons which induced its adoption, and the rules and principles which govern its operation and effect."

The celebrated case of Spreckels v. Spreckels, 116 Cal. 339, 347, 48 P. 228, 36 L.R.A. 497, 58 Am.St.Rep. 170, reaffirmed the view that not only was the community property system an inheritance from Spanish law, but that in so far as common-law judges were able to interpret foreign law in a strange language, an effort should be made to harmonize the divergent systems of law existing side by side. Also in Estate of Moffitt, 153 Cal. 359, 363, 95 P. 653, 1025, 1026, 20 L.R.A.,N.S., 207, the Supreme Court said: "The Spanish-Mexican civil law was, of course, the law in force in California at the time of its cession by Mexico to the United States, and it was the design of the Constitution of 1849 to preserve, so far as might be, to the wives of the inhabitants of the new state (most of whom were at that time former citizens of Spain or Mexico) the rights to the community property which they had enjoyed under the Mexican rule."

The Circuit Court of Appeals for the Tenth Circuit in the case of Hernandez v. Becker, supra, pointed out that community estates in New Mexico were not substitutes for dower and curtesy. While the legal history of New Mexico is not identical with that of California, it is essentially similar to that of this state, and the force of that decision must be considered persuasive in the case at bar. In that case upon the death of the wife the interests of the surviving husband were held not includible within the decedent's estate, since "such property did not fall within section 402(b), supra, because the common law rights of dower and curtesy have never obtained in New Mexico, and section 26, supra [New Mexico statutes] did not create an estate in lieu of curtesy."

Similarly, Judge Partridge's exhaustive study of the historical background of community estates in Robbins v. United States, D.C., 5 F.2d 690 (subsequently reversed on another point, in United States v. Robbins, 269 U.S. 315, 46 S.Ct. 148, 70 L.Ed. 285) reinforces this conclusion.

Such expressions by the courts would seem adequate in themselves to support the conclusion herein reached, without giving consideration to the argument that the wife's interest in community property always has been, and particularly is now by statutory amendment, an estate of such distinctive and unique character that it cannot be considered sufficiently like dower to be a substitute therefor.

The court therefore is of the opinion that Mrs. Sampson's one-half interest in the community property was not an interest created by statute in lieu of dower, and it should not have been included, under section 302(b), in computing the gross estate of her deceased husband.

The court thus far has held that the wife's interest in all of the property, regardless of when it was acquired, and regardless of whether it had been, prior to the agreement, the husband's separate property, community property, or their joint property, is not includible under sections 302(a) and 302(b) of the Revenue Act of 1926. But the act taxes not merely all the property within the decedent's estate, but also the value of property conveyed away by decedent at any time by those certain transfers specified in sections 302(c) and 302(d) of the act.

Before discussing the precise nature of the transfers so included, it may be well to observe certain facts in the case before us. First, the community property which was acquired after July 29, 1927, but before the agreement was entered into, was already owned by the husband and wife in present, existing, and equal interests. In other words, the interest of the wife in that property was, by virtue of the statute itself, already that which the agreement purported to make it. Therefore, no

interest greater than that which she already had was transferred to the wife, and hence none of the property of this class can be held to be covered under subsections (c) or (d). Next, the character of the wife's interest in community property acquired after the agreement, obviously was fixed by the statute and not by operation of the agreement, even though the latter governed the nature of property subsequently acquired, which would otherwise have been the separate property of the husband. It is apparent therefore that subsections (c) and (d) apply only to (1) community property acquired before July 29, 1927; (2) the separate property of the husband whenever acquired; and (3) that parcel of property owned in joint tenancy —the only three classes of property which were affected by the agreement.

This differentiation, between the effects of subsections (a) and (b) on the one hand, and subsections (c) and (d) on the other upon the various kinds of property here involved, is not a result of judicial interpretation. It is a matter of congressional enactment and Treasury regulation. Its propriety is no longer open to question. Its application to the facts at bar alone is at issue here. Consequently, the property rights of the wife in certain classes of property may readily fall within the scope of subsections (c) and (d) even though, as the court has indicated heretofore, they cannot be governed by subsections (a) and (b).

 Turning then to a consideration of subsection (c), we find that the act provides that there shall be included in the gross estate of the decedent all property "(c) to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, * * * intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth." 44 Stat. 70.

The pertinent sections of Treasury Regulations 70, identical in the 1926 and 1929 Editions, and which, having remained unchanged for a number of years, are thus entitled to great respect, are as follows:

"Transfers Intended to Take Effect in Possession or Enjoyment at or After Death.

"Art. 16. *General.*—All transfers made by the decedent subsequent to September 8, 1916, other than bona fide sales for an adequate and full consideration in money or money's worth, which were intended to take effect in possession or enjoyment at or after his death, are taxable, and the value, as of the date of the decedent's death, or property or interest so transferred must be returned as a part of the gross estate.

"Art. 18. *Reservation of income or an annuity.*—A transfer, not amounting to a bona fide sale for an adequate and full consideration in money or money's worth, is taxable where the decedent reserved to himself during life the entire income of the property transferred. In such a case the transfer of the principal takes effect in possession and enjoyment at the death of the decedent, and the value of the entire property should be included in the gross estate.

"Where the decedent reserved only a portion of the income, only a corresponding proportion of the value of the property should be included in the gross estate, unless, however, the possession or enjoyment of the remaining portion of the transferred property, or a part thereof, was postponed until at or after the decedent's death, in which case there should also be included in the gross estate such remaining portion or part thereof, as the case may be. * * *

\* \* \* \* \*

"Where there was no reservation of income or an annuity but it was intended that possession or enjoyment of the transferred property, or a portion thereof, should be postponed until at or after decedent's death, then the value of the entire property or such portion, as the case may be, should be included in the gross estate. Thus a gift of the principal intended to take effect either in possession or enjoyment at or after the decedent's death is taxable, although the income or annuity was payable during the decedent's life to some one other than himself. Example: The decedent transferred property to his son, the latter to receive the income during the decedent's life or agreeing to pay the income to his mother during the decedent's life. The transfer to the son in either case is taxable."

The sole question under this portion of the statute is to determine whether or not the agreement of May 23, 1929, constituted a transfer by Mr. Sampson intended to take effect in possession or enjoyment at or after his death.

It has been pointed out by the Supreme Court of the United States that the purpose of this subsection is to prevent evasion of the estate tax by decedents who make conveyances of their property, by trust or otherwise, but retain to themselves (during their lifetime) the substantial, use, possession, and enjoyment thereof. The effect of such a conveyance is testamentary. It makes no difference what the form or name of the conveyance may be. Klein v. United States, 283 U.S. 231, at page 234, 51 S.Ct. 398, 399, 75 L.Ed. 996; Chase National Bank v. United States, 278 U.S. 327, at page 335, 49 S.Ct. 126, 127, 73 L.Ed. 405, 63 A.L.R. 388; Reinecke v. Northern Trust Co., 278 U.S. 339, at page 345, 49 S.Ct. 123, 124, 73 L.Ed. 410, 66 A.L.R. 397; Saltonstall v. Saltonstall, 276 U.S. 260, at page 271, 48 S.Ct. 225, 227, 72 L.Ed. 565. While most of these decisions involve trust agreements, nevertheless their authority is persuasive as to transfers such as the one here involved.

The Circuit Court of Appeals in our own circuit, speaking through District Judge Norcross, in T. I. & T. Co. v. Goodcell, 60 F.2d 803, 804, said: "It was the death of her husband which 'brought into being or ripened for the survivor, property rights of such character as to make appropriate the imposition of a tax upon that result.' Tyler v. United States, 281 U.S. 497, 50 S.Ct. 356, 359, 74 L.Ed. 991, 69 A.L.R. 758."

Interpreting the act in the light of the intent of Congress, as defined above, the courts, as we have seen, have held that trust agreements, retaining in the grantor possession and enjoyment of the corpus of the trust, were within the scope of section 302(c), Dort v. Helvering, 63 App.D. C. 98, 69 F.2d 836, 839. Mr. Justice Groner, speaking for the Court of Appeals of the District of Columbia, in that case said that such a trust was taxable, quoting from Klein v. United States, supra: "Because there was likewise a retention by the grantor of an interest in the property by virtue of which its possession and enjoyment were withheld from any other until his death. It was only then that the transfer of possession or enjoyment of the corpus could take effect; and this and not the transfer of the fee or title determines the inclusion in the gross estate. * * ′ * Whatever such interest may be called, the decedent's death was the occasion upon which it became effective in possession as to the beneficiary."

Similarly the Circuit Court of Appeals for the Third Circuit, in McCaughn v. Girard Trust Co., 11 F.2d 520, 521, held that a trust agreement, purportedly irrevocable, but reserving to the grantor the right to occupy or use the corpus was a taxable transfer. Analyzing the agreement, the court said that the decedent in reality "was reserving to herself, or creating by the deed, the ordinary incidents of continued ownership, viz. exclusive possession and enjoyment of her real estate for herself and postponing the ordinary incidents of ownership, viz. possession and enjoyment, on the part of [the beneficiary] until after her own death. It was such a post mortem disposition of property 'to take effect in possession and enjoyment at or after his death' the statute subjected to taxation." See, also, Schneider et al. v. Commissioner, 35 B.T.A. 183, where the grantor had reserved the right during his lifetime to mortgage and control the corpus. Such a transfer was determined to be testamentary in effect, since by the retention of such powers the possession, enjoyment, and control of the property passed at the time of the grantor's death.

Turning again to the facts at bar, let us consider first what effect the transfer had upon the husband's separate property. Before the agreement the wife had practically no control over or interest in it. By the agreement, the husband transferred to her a part interest. It matters not in the least what the name of the interest is; but he did give her a present and existing share in it equal to his own.[4] However, he re-

---

[4] In this connection it has been suggested by counsel that had there been a gift tax law, as we now understand it, in effect on May 23, 1929, the agreement of that date would have been taxable thereunder. Revenue Act 1924, § 319, 43 Stat. 313; Revenue Act 1932, § 501, 26 U.S.C.A. § 550 and note; Regs. 79, art. 2. Furthermore, had such a gift tax been paid, credit therefor might have been allowed against the estate tax now in litigation. Revenue Act 1924, § 322, as amended by Revenue Act 1928, § 404, 26 U.S.C.A. § 413(a); Regs. 70, Art. 9 (b). Revenue Act 1926, § 301 (b), as amended by section 801 of the Revenue Act of 1932, 26 U.S.C.A. § 413(a) (2); Regs. 80, Art. 9(a). But between January 1, 1926 (repeal of the 1924 act) and June 6, 1932 (effective date of the 1932 act), there was no gift tax law in effect. This court cannot consider the

tained to himself the possession, the management, and the control of this property for his lifetime. Since he reserved to himself·in the agreement all powers given to him by sections 172 and 172a of the Civil Code, these powers of management and control were intended to pass to the wife only upon his death. While this intention may not be explicit in the instrument, it is the legal effect of what they did. The husband clearly could have given away full title and complete possession and control over the property by giving it to·her as her separate property. Had he done so, it clearly would not have been includible. But he chose rather to withhold from her precisely those fructifying attributes of ownership, which Congress felt should not be retained by the grantor, unless the transfer was to be considered as testamentary in character. Hence this transfer of a part interest in the husband's separate property is covered by the principles in the cases discussed, supra, and the property thereby conveyed is properly includible in the husband's gross estate.

Turning now to the community property acquired by the Sampsons before the adoption of section 161a, we observe that the wife already had some interest in this property—"an expectancy plus." The husband by this agreement gave her something more—an additional property interest, so that thereafter she had a present, existing, and equal interest. But he did not give her all that he had. He retained the possession and control of the property until his death, at which time the wife received the enjoyment thereof. It seems clear, therefore, that the interest of the wife in the community property which she received by virtue of the agreement is taxable under section 302(c) as part of the decedent's gross estate.

▆▆▆ It has been suggested by the taxpayer that since the only practical effect of the agreement was an immediate one —i. e., the right to divide community income for income tax purposes—the agreement was a transfer intended to, and which did, take effect at once and not at the death of the husband. But the wording of the statute does not exempt agreements which

have some effects immediately. It concerns itself solely with those transfers, which defer the passing of substantial benefits until the death of the decedent. Such was the precise case here. The fact that certain consequences took place at once, by virtue of the agreement, cannot remove the transfer from the scope of ·the section—when those certain constituents of ownership specified in the statute were withheld in precisely the manner designated by Congress as sufficient to make the transfer includible. The important thing is that the wife did not secure the possession, management, control, and full enjoyment of the community property covered by the transfer until the death of her husband. Hence, to the extent of the property interest which she received by the terms of this agreement, her share in the community property is includible in the husband's gross estate under section 302(c).

▆▆▆ At this point the question of valuation naturally suggests itself. The statute provides that the gross estate shall include the value of certain property interests which the decedent has transferred. The quantum of ·the property to be valued is determined by the extent of the interest transferred. The taxable value of the interest transferred, however, is estimated as of the date of death, not as of the date of transfer. Presumptively, under the Commissioner's determination, values in this case have been fixed accordingly, in the light of pertinent statutory provisions and the interpreting Treasury Regulations. The quantum of · the property interests involved has already been indicated by the court, as definitely as the state of the evidence permits.

▆▆▆ There still remains, however, the question of whether section 302(c) applies to the commutation of the wife's interest as a joint tenant into a present, existing and equal interest in community property. Under the California decisions, the wife's interest in property held by her and her husband in joint tenancy is her separate property, even when acquired with community funds. Siberell v. Siberell, 214 Cal. 767, 7 P.2d 1003; Delanoy v. Delanoy, 216 Cal. 23, 13 P.2d 513; Young v. Young,

taxpayers' argument that since the transfer might have been taxable under a law not actually on the statute books, it therefore cannot be covered even by the clear terms of a law actually in operation. Concededly, gift taxes and estate taxes

are more or less complementary in nature. But the mere absence of the former cannot limit the scope of the latter, unless a clear congressional declaration to that effect has issued.

126 Cal.App. 306, 14 P.2d 580; Burrows v. Burrows, 10 Cal.App.2d 749, 52 P.2d 606; In re Sterling, D.C., 20 F.Supp. 924, per Yankwich, J. Consequently before the agreement, Mrs. Sampson enjoyed as her separate property an undivided half-interest in the whole of that parcel of realty owned in joint tenancy. By the doctrine of the four unities of interest, title, time and possession (Siberell v. Siberell, supra), she likewise had actual present possession of that property, and as a corollary to that proposition, present management and control as well. By virtue of the doctrine of survivorship, she might entertain the hope of becoming complete owner of the whole if she outlived her husband.

After the agreement, however, she had a present interest in one-half of the whole, but she had lost the rights of management, control and possession. While she now enjoyed a statutory right to dispose of her half, by will, in case she died first—a right not hers as a joint tenant—such a right would be of value only if the husband had not squandered the community property in the meantime. Furthermore, if the husband died first, she could be sure of receiving only her half of the community property, and even then that half would be subject to the husband's debts and expenses of administration. If the husband died intestate, or if he bequeathed her his share, she would receive all the community property, still subject however to his debts and the expenses of administering his estate. These fettered and conditional rights which she secured for herself by the agreement of May 23, 1929, seem definitely less advantageous to her than those she enjoyed as a joint tenant. But it might well be asked whether her property rights were thereby made less valuable. Viewing the matter realistically, it would appear that the wife gave up more value than she received. Hence here, as in most cases, the net effect of such an agreement would be that she transferred something to her husband, rather than that he gave something to her.[5] In the court's view, what Congress was seeking to tax was a transfer by a decedent which retained the beneficial incidents of ownership in him until his death. Conceding that there is undoubtedly a commutation of interests here, the court is unable to say that there is taxable *transfer* within the meaning of either section 302 (c) or (d) of the Revenue Act.

Manifestly such a conclusion is but an approximation. There is however no expression by either the California Legislature or the Congress of the United States giving any indication as to the relative size —for estate tax purposes—of estates in joint tenancy and estates in community property acquired after July 29, 1927. Pending the establishment of such a definite and tangible standard of comparison by the policy-making and law-creating agencies, this court must invoke the fundamental rule that a tax statute should be held to cover only those situations clearly within its scope, and that any ambiguities should be resolved in favor of the taxpayer. Gould v. Gould, 245 U.S. 151, 38 S. Ct. 53, 62 L.Ed. 211.[6]

---

[5] This result obviously ignores the fact that in some instances—and perhaps even in this case—the wife's right to dispose of her share by will, after the agreement, might be so beneficial as to outweigh in present value all the detriments suffered as a consequence of the agreement. A half of a bird in the hand might well be valued higher than a whole one in the bush, acquisition and disposition of which hinged on survivorship. It might also be argued that although the wife beneficially gave up more, she did receive by the transfer a half-interest in a new estate, with certain rights of possession, management and control therein retained by the husband. In such cases, the tax might well and justly apply. But since this court now feels that such situations would be the exception rather than the rule, it is not within the judicial province to stretch the statute to cover the case, to the detriment of the taxpayer. Rather the solution lies in legislative amendment of the law.

[6] The court's treatment of this point may at first seem inconsistent with what has been said heretofore as to the enlargement of the wife's rights over her husband's separate property and over the community property acquired before the passage of section 161a. In such transmutations, there clearly was a transfer of something to the wife clearly within the plain terms of the statute. Here the transfer probably was to the husband and hence not within any unstrained meaning of the act. Even assuming the transfer might be from the husband, the doubtfulness of the statute's application seems so manifest as to compel a decision for the taxpayer. In tax matters especially, the courts face the duty of enforcing clear law, and of pointing out to Congress those laws which are not clear enough to be enforcible without injustice.

Regardless of what has been said hereinbefore as to subsections (a), (b), and (c) of section 302, the court believes that the really crucial question involved in this case is the applicability of section 302 (d), which subjects to the estate tax certain transfers made by the decedent as follows: "To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth."

The Treasury Department has, in Regulations 70, interpreted that section as follows: "Art. 19. *Power to Change Enjoyment.* The value of property transferred, other than by a bona fide sale for an adequate and full consideration in money or money's worth, constitutes a part of the gross estate if at the time of decedent's death the enjoyment thereof was subject to any change through a power, exercisable either by the decedent alone or in conjunction with any person, to alter, amend, or revoke."

The courts have not yet passed upon the precise question at bar—whether an agreement such as this one, involving community property, is a transfer within the meaning of subsection (d). But they have dealt with situations closely analogous. The United States Supreme Court in Porter v. Commissioner, 288 U.S. 436, 53 S.Ct. 451, 453, 77 L.Ed. 880 said that subsection (a) does not limit the effect of subsection (d) to interests of the decedent at the time of his death. It said also that subsection (d) covers trusts in which the decedent reserves the power to revise completely the amounts to go to each beneficiary or in which he reserves even the power to change any of the beneficiaries. The court said: "It is true that the power reserved was not absolute. * * * But the reservation here may not be ignored for, while subject to the specified limitation, it made the settlor dominant in respect of other dispositions of both corpus and income. His death terminated that control, ended the possibility of any change by him, and was, in respect of title

to the property in question, the source of valuable assurance passing from the dead to the living. That is the event on which Congress based the inclusion of property so transferred in the gross estate as a step in the calculation to ascertain the amount of what in section 301 (26 U. S.C.A. §§ 1092, 1093) is called the net estate."

The United States Supreme Court again, in Helvering v. City Bank Farmers' Trust Co., 296 U.S. 85, 56 S.Ct. 70, 73, 80 L.Ed. 62, said that even where the power to change the enjoyment of the beneficiaries was only to be exercised jointly with a beneficiary himself the trust was still includible. Mr. Justice Roberts pointed out: "The respondent insists that a power to recall an absolute and complete gift only with the consent of the donee is in truth no power at all; that in such case the so-called exercise of the power is equivalent to a new gift from the donee to the donor. And so it is claimed that the statute arbitrarily declares that to exist which in fact and law is nonexistent. The position is untenable. The purpose of Congress in adding clause (d) to the section as it stood in an earlier act was to prevent avoidance of the tax by the device of joining with the grantor in the exercise of the power of revocation some one who he believed would comply with his wishes. Congress may well have thought that a beneficiary who was of the grantor's immediate family might be amenable to persuasion or be induced to consent to a revocation in consideration of other expected benefits from the grantor's estate."

This view was also expressed by the Court of Appeals for the District of Columbia in Dort v. Helvering, 63 App. D.C. 98, 69 F.2d 836, 841, where it was said, referring to the decision in Porter v. Commissioner, supra: "This is a distinct holding that, though the trust agreement may contain no reservation of the power to revoke—indeed, though there shall be an actual prohibition—yet if it contains a right to change the enjoyment, it is within the terms of the act."

The Circuit Court of Appeals for the Fourth Circuit in Holderness v. Commissioner, 86 F.2d 137, held subdivision (d) to apply to trusts created by transfers, where, although the beneficiaries could not be changed, the proportionate amounts they could receive were alterable under the reserved power. That court referred ap-

provingly to the decision of the Circuit Court of Appeals for the Second Circuit in Commissioner v. Chase National Bank, 82 F.2d 157, 158, where on similar facts the court said: "Up to the time she [the decedent] died she had the power to alter the proportions in which her descendants should take the property in accordance with the original terms of the trust instrument. She could have limited any, or all but one, of them to a nominal amount and given all of real value to one or to such of them as she pleased. * * * The power she reserved was not to change the trust provisions in a trivial way, but went right to the heart of them and gave the decedent a substantial though qualified control over the trust property until her death. * * * The decedent, having the right to change the economic benefit, had the power to alter within section 302(d) of the 1926 Act even though she could not benefit herself in a pecuniary way by the change. Witherbee v. Commissioner (C.C.A.2) 70 F.2d 696."

Our distinguished colleague on this district bench, Judge McCormick, reached a similar conclusion in Mead v. Welch, D.C., 13 F.Supp. 981, 983, where he said: "They [the grantors] have reserved expressly the right and the power to change the beneficiaries and also the amounts and periods to which a beneficiary shall be entitled to share in the trust estate. Nothing could be more clearly expressed than the absolute control reserved by the trustors during their lifetimes as to whom, and in what amount, and for what times, persons might become beneficiaries of the bounty of the two persons who created the trust."

See, also, another well-considered opinion in Foster v. Commissioner, 31 B.T.A. 769, which reiterates the above general principles.

Having clearly in mind then the law as above enunciated, we turn to the provisions of the Sampson agreement. By its terms, the husband specifically reserved the power to exercise over the community property every right given him by sections 172 and 172a of the California Civil Code. These rights included authority, as to the personal property, to sell it without the wife's consent for an insufficient though valuable consideration, to waste it, to dissipate it in riotous living, and to speculate with it. As to the real property, he could subject all of it to his debts, contracted with or without the wife's consent. 3 Cal. Jur.Ten Year Supp. pp. 663-666. All these things he could do without consulting the wife, by virtue of the authority reserved in himself by the express terms of the agreement. In addition, he could do certain things with the consent of the wife. He could give away the personal property —indeed, he had the power to give it away without her consent, subject only to her right to declare the gift voidable within a certain period and in any event before the property fell into the hands of a bona fide purchaser. The husband had reserved unto himself the right to convey away the real property, with the wife joining in the conveyance. Here again, if it stood in his name alone, he might convey it without her consent, subject only to her right to declare the transfer voidable within a year and before the property had been passed on to a bona fide purchaser. See 18 Calif. L.Rev. 400, 24 Calif.L.Rev. 306, and 26 Calif.L.Rev. 376, for discussions as to the practical value of this remedy.

Applying now the law to the facts: Mr. Sampson could, by exercising powers reserved in the agreement, materially alter the present and future enjoyment of the wife in the community property, even without her consent. Such a transfer is taxable. Porter v. Commissioner, supra; Holderness v. Commissioner, supra; Commissioner v. Chase National Bank, supra; Mead v. Welch, supra; Foster v. Commissioner, supra. In other respects Mr. Sampson could do certain acts only with the consent of the wife. Since the agreement reserved to him the right to exercise these powers "in conjunction with any person," it is a transfer within the purview of section 302(d). Helvering v. City Bank Farmers' Trust Co., supra; Dort v. Commissioner, supra.

The fact that the husband could not do certain other things—such as give away the wife's half of the property (Beemer v. Roher, 137 Cal.App. 293, 30 P.2d 547) nor partition the property without the wife's consent (Smedberg v. Bevilockway, 7 Cal. App.2d 578, 46 P.2d 820)—is immaterial. The powers reserved in the instrument need not be complete. The power to effect any substantial change is enough. As was said in Dort v. Helvering, supra, 63 App.D.C. 98, 69 F.2d 836, at page 841, "the provisions of subdivision (d) are not confined to cases where the right to complete revoca-

tion is reserved. We have, therefore, here a trust in which the donor can only cancel and reinvest the property in himself under certain named conditions, but he may, under the reservation to change, otherwise make such alteration in the disposition of the beneficial interest as he may desire. It is this right which, in our view, brings the instrument within the provisions of subdivision (d). * * * In other words, it is a power to affect the rights in the trust property."

The cases of Helvering v. Helmholz, 296 U.S., 93, 56 S.Ct. 68, 80 L.Ed. 76, and White v. Poor, 296 U.S. 98, 56 S.Ct. 66, 80 L.Ed. 80, may be distinguished on the ground that in those cases there was no power reserved in the instrument to alter, amend, or revoke. Commissioner v. Chase National Bank, supra.

It has been suggested that this transfer cannot fall within the intended scope of section 302(d), because the statute implies that the power reserved must be a power to affect the beneficiaries' enjoyment by an alteration of the terms of the transfer or trust agreement itself, and not merely by disposing of the subject matter of the agreement. This is to say that section 302(d) would not apply to a trust by A to B as trustee for the benefit of C; the terms of which A could not change, but the corpus of which A could, until he died, handle, squander, or completely dissipate as he pleased. To state such a proposition is to refute it. The wording of the act is clear. To put such an interpretation upon it is to obscure, not clarify, its meaning.

"We are not at liberty to construe language so plain as to need no construction, or to refer to committee reports where there can be no doubt of the meaning of the words used. The section applies to this transfer." Helvering v. City Bank Farmers' Trust Co., 296 U.S. 85, at page 89, 56 S.Ct. 70, 72, 80 L.Ed. 62.

Such a suggested meaning would defeat the evident intent of Congress to levy a tax on tax-avoiding transfers.

"It was appropriate for Congress to prescribe that if, subsequent to the passage of that act, the creator of a trust estate saw fit to reserve to himself jointly with any other person the power of revocation or alteration, the transaction should be deemed to be testamentary in character, that is, treated for the purposes of the law as intended to take effect in possession or enjoyment at the death of the settlor."

Helvering v. City Bank Farmers' Trust Co., supra, 296 U.S. 85, at page 92, 56 S.Ct. 70, 74, 80 L.Ed. 62.

This result cannot be said to be double taxation or to work a hardship on taxpayers. After all, husbands and wives, in dealing with their community property, may take such steps as they deem advantageous to reduce their tax burden. They know that they are subject to income taxes on the income from their property. They know that if a gift of such property is made, a gift tax may apply, but that by such gift their own income taxes may be advantageously reduced. If they retain the property until either husband or wife dies, then an estate tax may be levied on the share of the decedent or on transfers made by the decedent in avoidance of the reasonable scope of the estate tax act. Their courses are free and optional. The consequences of each course are or should be known.

Here an agreement was entered into with the evident and admitted purpose of reducing income taxation. It amounted in nature to a gift. Perhaps, had there been a gift tax applicable, such a transfer would have been taxable thereunder; but again we are not concerned with that phase of the problem, which is a matter for congressional legislation. In any event there was already enacted section 302(d) of the Revenue Act of 1926. Its provisions applied to transfers previously made by a decedent, the beneficiaries of which enjoyed complete fruition of the gift—complete assurance of its possessory enjoyment—only at the death of the decedent. Such a tax is constitutional. Porter v. Commissioner, supra. This transfer is clearly within the act. No one should complain that it is unjust in the abstract, that a device reducing income taxes might lead to a corresponding increase in liability under another tax law, when Congress clearly contemplated the inclusion of all such devices as taxable within the latter act. The taxpayer makes the choice in the light of the existing revenue acts. The choice invoking their enforcement lies with the taxpayer, not with this court.

The decision of this court therefore is as follows:

1. As to community property of the Sampsons acquired before July 29, 1927: The agreement operated to bestow upon Mrs. Sampson such an interest therein as to permit the inclusion under section 302

(a) and (b) of only one-half of the property in this category in the gross estate of her deceased husband. The agreement was, however, such a transfer as to come within the terms of sections 302 (c) and (d), and ·the property interest bestowed thereby on Mrs. Sampson was includible in Mr. Sampson's gross estate.

2. As to the separate property of William O. Sampson, acquired before December 28, 1930: The agreement operated to bestow upon Mrs. Sampson such an interest therein as to permit the inclusion under sections 302 (a) and (b) of only one-half of the property in this category in the gross estate of her deceased husband. The agreement was, however, such a transfer as to come within the terms of sections 302 (c) and (d) and the property interest bestowed thereby on Mrs. Sampson was includible in Mr. Sampson's gross estate.

3. As to real property owned in joint tenancy, acquired before May 23, 1929: The agreement operated to bestow upon Mrs. Sampson such an interest therein as to permit the inclusion under sections 302 (a) and (b) of only one-half of the property in this category in the gross estate of her deceased husband. The agreement was not, however, such a transfer as to come within the terms of sections 302 (c) and (d), and the property interest bestowed thereby on Mrs. Sampson was not includible in Mr. Sampson's gross estate.

4. As to community property acquired after July 29, 1927, but before May 23, 1929: Mrs. Sampson, by virtue of section 161(a) of the California Civil Code, enjoyed such an interest in property in this category as to permit the inclusion under either section 302 (a), (b), (c), or (d) of only one-half of such property in the gross estate of her deceased husband. As to property in this category the agreement did not operate as a transfer within the terms of sections 302 (c) and (d).

5. As to community property acquired after May 23, 1929, but before Mr. Sampson's death on December 28, 1930; Mrs. Sampson, by virtue of section 161(a) of the California Civil Code, enjoyed such an interest in property in this category as to permit the inclusion under either sections 302 (a), (b), (c), or (d) of only one-half of such property in the gross estate of her deceased husband. As to property in this category the agreement did not operate as a transfer within the terms of sections 302 (c) and (d).

Counsel will present findings of fact and conclusions of law in accordance with the foregoing opinion. In case counsel are unable to agree—during the preparation of such findings and conclusions—as to the exact date of acquisition of any property involved, or upon a final computation of the amounts to be entered in the judgment, the case may be reopened for the strictly limited proceedings specified in the stipulation entered into by counsel at the trial.

So ordered.